# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| **LINDA SURRATT, Individually** § | |
| **And as heir and Legal** § | |
| **Representative of the Estate of** § | |
| **LESA ANN SURRATT** § | |
| **(Deceased), Plaintiff** § | |
| § | |
| **v.** § | **CIVIL ACTION NO. 4:14cv338** |
| § | |
| § | |
| **OFFICERS BRIAN MCCLARAN,** § | |
| **TOM CAVER &TREVOR STEVENS &** § | |
| **CITY OF SHERMAN , Defendants** § | |

### AFFIDAVIT OF DR. MICHAEL LYMAN

**STATE OF MISSOURI**

**COUNTY OF BOONE**

DR. MICHAEL LYMAN, being first duly sworn upon oath, deposes and states as follows:

"My name is Dr. Michael Lyman. I am 18 years of age or older and competent to make this affidavit. I make this affidavit of my own knowledge, and in support of Plaintiff Linda Surratt's Response to Defendants' motion for summary judgment herein.

Attached hereto as Exhibit A is a true and correct copy of my expert report (the "Report") in *Linda Surratt v. Officers Bryan McClaran, Tom Caver, Trevor Stevens & City of Sherman*. The facts regarding my knowledge, skill, training and experience contained in the Report are true and correct, and are incorporated herein as if fully set forth at length herein. The Report correctly states my opinions in this case. The Report is based on my scientific, technical, or other specialized knowledge which will help the trier of fact to understand the evidence or to

---

**AFFIDAVIT OF DR. MICHAEL LYMAN**        **PAGE 1**

determine the facts at issue in this case, is based on sufficient facts or data, is the product of reliable principles and methods, and I have reliably applied the principles and methods to the facts of this case.

My opinions are based on facts or data from this case that I have been made aware from disclosures and discovery provided to me herein, and such data is reasonably relied on experts in forming similar opinions.  If called as a witness, I would testify to the same statements, observations, conclusions and opinions as outlined in the Report."

Further affiant sayeth not.

**SUBSCRIBED AND SWORN TO BEFORE ME** on February 3 , 2015, to certify which witness my hand and seal of office.

Notary Public, State of Missouri

CONTESSA DRYDEN
Notary Public - Notary Seal
State of Missouri
County of Boone
My Commission Expires January 20, 2018
Commission #14569048

**AFFIDAVIT OF DR. MICHAEL LYMAN          PAGE 2**

Michael D. Lyman, Ph.D.

8703 Hunter Valley Dr.  •  Columbia, MO  •  65216  •  (615) 875-7472

# EXPERT REPORT OF MICHAEL D. LYMAN, PH.D.

*Re: Linda Surratt vs. Officers Brian McClaran, Tom Caver, Trevor Stevens & City of Sherman:*
*Civil Action No.: 4:14cv338.*
*In the United States District Court Eastern District of Texas Sherman Division*

December 27, 2014



## Introduction

The opinions set forth in this report are based on my analysis of documents and testimony provided to me in this case and as informed by my formal training, education, independent research, and experience gained over a collective 40 years as a law enforcement agent, criminal investigator, police trainer and educator.

I have been a college professor teaching and researching in the area of policing for 27 years. I have also authored numerous articles and books dealing with different aspects of police operations for the last 27 years. In the latter capacity, I have become nationally recognized in the areas of police procedure, criminal investigation, drug enforcement and related areas. Prior to becoming an educator, I was a certified generalist police instructor for three years, training police officers and police officer candidates in various police techniques and procedures.

Before entering the field of higher education, I was employed as a criminal investigator working in both Kansas and Oklahoma for a collective period of eleven years. In that capacity, I conducted criminal investigations, made misdemeanor and felony arrests, conducted interviews of suspects, testified in state and federal criminal courts and had considerable experience in the development of police policy and procedure.

## Qualifications

My formal education includes an undergraduate and master's degree from Wichita State University in the Administration of Justice. In 1992, I received a Ph.D. from the University of Missouri-Columbia in Higher and Adult Education. My previous police training includes basic police academies certified through the Council on Law Enforcement Education Training (CLEET) in Oklahoma City, Oklahoma, and the Kansas Law Enforcement Training Academy in Hutchinson, Kansas (KLETA).

During my years as a criminal investigator, I accumulated in excess of 2000 hours of formal, in-service, police training. This training was sponsored by organizations which include the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), the United States Customs Service, and numerous state and local law-enforcement organizations. Training included firearms qualification, shoot-don't shoot scenarios, practical simulations involving felony arrests, search and seizure, interview and interrogation, vehicles stops, building searches and crisis intervention.

I served for three years as a full-time, certified police instructor employed by the Law Enforcement Training Institute in Columbia, Missouri. I held generalist certification issued by the Missouri Department of Public Safety and in that capacity was awarded Police Instructor of the Year in 1989. As a police instructor I trained literally thousands of law enforcement officers serving in all levels of professional law enforcement. As a police trainer, I have taught by lecturing as well as by utilizing computer-based simulations, videos and professional writings by law enforcement officers in the field. My 27-year publishing record has also contributed greatly to my understanding of police procedures and I have brought much of that research into the police training environment.

I am currently employed as a tenured faculty member of the Columbia College Department of Criminal Justice and Human Services, Missouri, and have been on the faculty since August 1989. My rank is that of Full Professor. I also serve as the departmental Liaison for Graduate Studies for the Master of Science in Criminal Justice degree program and the Director of the Bachelor of Science in Forensic Science Program.

Between August 1989 and November 2000, I served as the department chairman overseeing a faculty of seven in a department representing over 250 criminal justice majors. Between 1985 and

1994 I was a Visiting Professor for the University of Oklahoma teaching on a part-time basis during the summer and winter intercessions. In 1985 and 1986 I taught graduate classes at the University of Central Oklahoma.

Since 1987, I have authored seven books dealing with various areas of policing. These have been published by both nationally and internationally recognized publishing houses which include Prentice Hall (Upper Saddle River, NJ), Anderson Publishing (Cincinnati, OH), CRC Press (Boca Raton, FL), and Charles Thomas Publishing (Springfield, IL). The research required for these books necessitates a close working relationship with law-enforcement officers on local, state, and federal levels as well as a working knowledge of the available literature on policing.

My investigative experience includes an appointment as a criminal investigator assigned to the Special Services Division of the Kansas Bureau of Investigation. This unit functioned as the special investigations unit for the State of Kansas and its members are involved in criminal investigations involving drug trafficking, organized crime and related offenses.

I have also been employed as a Senior Agent in Oklahoma, assigned to the Enforcement Division and the Intelligence Division of the Oklahoma Bureau of Narcotics and Dangerous Drugs Control (OBNDDC). In each of these units my responsibilities were to conduct intelligence, criminal and internal affairs investigations. In this capacity I also served on numerous hiring, shooting and disciplinary boards. While employed with the OBNDDC, I wrote the Standard Operating Procedure Manual for Conducting Wire Taps for the Bureau.

My responsibilities in both Kansas and Oklahoma required me to conduct criminal investigations, internal affairs investigations, assist in the establishment of agency policy and procedures in numerous areas, provide training, work closely with other law enforcement agencies on all levels and work closely with other public safety organizations as they related to my duties.

I currently maintain professional affiliations with The Academy of Criminal Justice Sciences (ACJS); the American Society of Criminology (ASC); the Textbook Author's Association; the Police Executive Research Forum (PERF); the International Association of Chief's of Police (IACP); the American Academy of Forensic Science (AAFS); the International Association for the Study of Organized Crime (IASOC) and the American College of Forensic Examiners International (ACFEI).

The documents and testimony from this case, upon which my opinions are based, include police reports, medical records, court records, professional articles, and policy-based research in the area of police procedure.

The information that I have reviewed and considered in this case is the type of information that I, and others in my field, reasonably rely upon in examining, analyzing, and determining causation, as well as rendering opinions on proper police conduct. The body of knowledge that I have reviewed over the years includes texts, research, journals, periodicals and other publications, along with my personal research, experience, training, interaction with colleagues, discussions, interviews and training with law enforcement officers, police supervisors and command staff, as well as my academic studies, teachings and nationally-recognized, peer-reviewed research all form the foundation for my opinions. As a result, my opinions, and basis for my opinions, are provided with a reasonable degree of law enforcement and police certainty.

**Facts & Background**

I have been asked by the law firm of Micah Belden to review the case of *Linda Surratt vs. Officers Brian McClaran, et. al.,* and render independent professional opinions. The following is my written report regarding the above referenced case as of the date of this report. My opinions are based on the documents provided to me in this case to date as well as my training, education, experience and research in the field of policing. I realize that the discovery process is ongoing in this case and reserve the right to amend or modify my opinions based on additional information that is provided to me, including additional deposition testimony and/or documents.

On Tuesday, August 20, 2013, at about 9:00 p.m., Sherman Police Detective Brian McClaran was contacted by a confidential source that provided information about two drug suspects: Lesa Surratt and a female known only as Monica (later identified as Monica Ann Garza).[1] McClaran was working drug investigations with Sergeant Jason Jeffcoat at the time.

The confidential source told McClaran that Surratt and Garza were selling large quantities of methamphetamine and cocaine In the Sherman area. The confidential source also told McClaran that the females frequented the residence of Ernest Quincy Williams who was a known drug dealer residing on Maxey Street.[2] Surratt was allegedly driving a maroon colored rental vehicle. The confidential source also stated that the females would hide drugs in their bras and/or underwear while transporting them.[3] Surratt allegedly liked to play the "8 liner" machines at Whitney's Grocery Store and sell drugs at the same location.[4]

McClaran stated that Surratt was a known drug user and dealer and he had personally known her for over 12 years when first coming into contact with her as a police officer. McClaran and Jeffcoat drove by Williams' residence on Maxey Street as well as Whitney's Grocery Store looking for Surratt's vehicle. At about 9:00 p.m., a maroon Jeep Compass SUV was seen stopped in front of Williams' residence in the 500 block of Maxey Street with the lights on, and the driver of the vehicle was speaking with Williams.[5] Surratt drove away and headed toward Whitney's Grocery Store. Upon her arrival, McClaran saw two females exit the vehicle and go inside Whitney's.[6] While McClaran and Jeffcoat observed the SUV, they contacted Sherman Police Officer Tom Caver.

Caver stated that he was contacted by Jeffcoat who informed him of the maroon SUV.[7] Jeffcoat told Caver that Surratt supposedly had drugs on her person, in her bra and/or panties. Jeffcoat asked Caver to develop probable cause to stop the SUV for a traffic violation and then arrest Surratt for the traffic violation and take her to the Grayson County Jail where a female correctional officer would search her.

Caver parked a few blocks south of Whitney's Grocery Store and waited for Surratt to exit in the SUV. After waiting a short time, Jeffcoat notified Caver that the SUV had exited the grocery store. Caver saw the SUV and began to follow it. When he observed the SUV commit a traffic violation

---

[1] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of McClaran by Oliver and Cox, p. 18 of 35
[2] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of McClaran by Oliver and Cox, p. 18 of 35
[3] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of McClaran by Oliver and Cox, p. 18 of 35
[4] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of McClaran by Oliver and Cox, p. 18 of 35
[5] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of McClaran by Oliver and Cox, p. 18 of 35
[6] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of McClaran by Oliver and Cox, p. 18 of 35; Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Jeffcoat by Oliver and Cox, p. 20 of 35
[7] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 13 of 35

(right turn signal on, but turned left onto Hazelwood Street), at about 9:43 p.m., he initiated a traffic stop of Surratt's vehicle at the 400 block of Hazelwood Street.[8]

Caver stated that when he first made contact with the driver of the vehicle (Surratt), she appeared nervous and could not readily locate the insurance on the vehicle - which was a rental. Caver then placed Surratt under arrest for a turn signal violation. He then handcuffed her behind her back, double locked the handcuffs and placed her in the back left seat of his patrol unit.[9] Caver then arrested Garza after discovering she had outstanding traffic tickets out of the Sherman Police Department, Garza was also handcuffed behind her back and placed into the back right seat of officer Cavers patrol vehicle.

At about this time, Police Officer Trevor Stevens stated that he overheard on the police radio, Caver checking someone for warrants and noted on his in car mobile terminal there were no back up units assigned to back up Caver.[10] Stevens proceeded to assist Caver and arrived at the scene of the stop at about 9:53 p.m., and after parking behind Caver's vehicle.[11]

Caver was in the process of placing Garza in the rear seat of his vehicle as Stevens met Caver at his [Caver's] vehicle. Caver placed seat belts on Surratt and Garza.[12] Note that Caver's vehicle was equipped with an in-car video system that captured images of the actions of Surratt and Garza as they were seated in the back of Caver's vehicle. Also note that according to the record, neither Surratt nor Garza had been searched before being placed in Caver's police vehicle.

Surratt and Garza asked Caver if he would retrieve certain items such as a purse and shoes, from the maroon SUV. Caver agreed and he walked up to Surratt's vehicle with Stevens following.[13] Surratt and Garza remained in the back seat of Caver's vehicle.[14] Caver then asked Stevens to go watch Surratt and Garza due to the fact they were supposed to have illegal drugs concealed on their person.[15]

Stevens went back to the police unit where Surratt and Garza were sitting and opened the back left passenger door.[16] Upon opening the door Stevens heard a loud noise as if something had dropped.[17] He also noticed that Surratt's legs were shaking and she seemed nervous.[18] He asked Surratt what had dropped and she denied dropping anything. Stevens stated that he saw Surratt's skirt pulled up, exposing her panties.[19] Stevens then called over his handheld radio for Caver to come to the police unit.

---

[8] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 14 of 35
[9] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 14 of 35
[10] Stevens' Case Supplemental Report dated 8-21-13; Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Stevens by Oliver and Cox, p. 16 of 35
[11] Stevens' Case Supplemental Report dated 8-21-13
[12] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 14 of 35
[13] Stevens' Case Supplemental Report dated 8-21-13
[14] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 14 of 35
[15] Stevens' Case Supplemental Report dated 8-21-13; Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 14 of 35; Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Stevens by Oliver and Cox, p. 16 of 35
[16] Stevens' Case Supplemental Report dated 8-21-13; Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Stevens by Oliver and Cox, p. 16 of 35
[17] Stevens' Case Supplemental Report dated 8-21-13; Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Stevens by Oliver and Cox, p. 16 of 35
[18] Stevens' Case Supplemental Report dated 8-21-13
[19] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Stevens by Oliver and Cox, p. 16 of 35

Caver went to the back right passenger door while Stevens was standing at the back driver passenger door, which was open.[20] Caver observed Surratt holding an item behind her back and grabbed her hand. It was at this time, he noticed Surratt had removed one of her handcuffs.[21]

At this time, Caver also noticed Surratt was chewing something and realized she had placed something in her mouth.[22] Caver utilized a pressure point technique where he placed one of his fingers at the junction of Surratt's lower jaw and neck, in an attempt to make her open her mouth and spit the item out. However, this did not work because he was not aware that Surratt had already swallowed the item.[23]

Stevens stated that upon realizing Surratt had something in her mouth, Caver used his left thumb to apply pressure to the right side of Surratt's jaw and when she moved her head away from Caver, Stevens placed his forearm along the left side of Surratt's neck and head to restrict movement.[24] Stevens recalled Caver pulling Surratt toward his location in an attempt to gain control of the item that Surratt had clutched in one of her hands.[25]

As Caver was attempting to remove Surratt from the police vehicle, it appeared to him that she was seizing.[26] Caver called for additional units and an ambulance. He pulled Surratt across Garza's lap and onto the ground outside of the patrol vehicle. Caver described Surratt as turning "blue…"

McClaran stated that when he overheard Stevens on the police radio calling for additional units, he and Jeffcoat immediately went to the officers' aid. McClaran stated that he saw Caver pulling Surratt out of the back passenger door of the police unit. He also said he believed that Surratt was fighting the officers.[27] Caver quickly informed them that Surratt was not breathing. McClaran stated that Surratt's lips and face had turned blue.[28]

McClaran stated that he first thought Surratt was having a seizure so he stood between her legs in an attempt to keep her from kicking. He realized however that she was not breathing and was choking. Caver, along with other officers, began life saving measures on Surratt until paramedics arrived on the scene. During this time, McClaran attempted a Heimlich Maneuver and chest compressions on Surratt.[29] Paramedics used long forceps to remove a sandwich bag containing an unknown substance from Surratt's throat.

Surratt was taken to Texas Presbyterian Hospital-Wilson N. Jones, where she was found to be brain-dead and could no longer sustain life outside of life support and in a vegetative state. On September 2, 2013, Surratt was removed from life support and declared dead. Justice of the Peace Frank Bruda ordered an autopsy.

---

[20] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 15 of 35; Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Stevens by Oliver and Cox, p. 16 of 35
[21] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 15 of 35
[22] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 15 of 35
[23] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 15 of 35
[24] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 5 of 35
[25] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Stevens by Oliver and Cox, p. 17 of 35
[26] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 15 of 35
[27] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of McClaran by Oliver and Cox, p. 19 of 35
[28] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of McClaran by Oliver and Cox, p. 19 of 35
[29] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of McClaran by Oliver and Cox, p. 19 of 35

According to the record, Ranger Oliver received the results of the autopsy report on October 11, 2013. The report was signed by Dr. Candice Schoppe and stated that the cause of death was a result of complications of asphyxia; obstruction of airway by plastic bag.[30]

### Opinions: Basis and Reasoning

All of my opinions are stated within a reasonable degree of certainty within my field. My opinions and the basis for my opinions are based on the totality of my specialized knowledge, skill, education, research, literature, training and information I have reviewed. My opinions and basis for my opinions are based on sufficient facts and data reviewed; are the product of reliable law enforcement principles and methods; and I have applied these law enforcement principles and methods reliably to the facts and circumstances of this case.

There is a body of knowledge and literature about the practice and standards to which modern, professionally administered police agencies should adhere. These standards and accepted practices have evolved over time in the interest of fostering and maintaining police agencies that are professional, effective and whose practices and policies are observant of the law. The standards have evolved, in part, as a response of reported cases of police misconduct and as tools to limit police discretion and ensure that police behavior is within acceptable professional, legal and constitutional limits.

There is a substantial body of literature and knowledge regarding the types of causes of police misconduct. I am well familiar with and have contributed to the literature and body of knowledge regarding the types and causes of police misconduct. Within the broad range of criminal justice, my area of study and practical experience is and has been police misconduct and its relationship with police policy, procedure, training, and supervision and accountability mechanisms. I am currently an active member of the International Association of Chiefs of Police (IACP), Academy of Criminal Justice Sciences (ACJS) the American Society of Criminology (ASC) and the American College of Forensic Examiners International (ACFEI).

### Discussion and Opinions

I have been asked to review this case with regard to the actions of defendant officers McClaran, Caver and Stephens and consider the extent their actions and behaviors leading up to the in custody death of Lesa Surratt were proper, professional and consistent with nationally recognized standards of care. Specifically, I will consider (1) the practices, customs and policies of the Sherman Police Department as they relate to proper prisoner restraint; (2) police field tactics as they relate to forcefully restricting a prisoner's ability of a prisoner to breathe when they are suspected of attempting to swallow drugs, and (3) the extent the Sherman Police Department had established written directives addressing proper prisoner restraint and dealing with prisoners who are believed to have attempted to swallow drugs.

**I. The manner in which Lesa Surratt was secured in handcuffs by Officer Tom Caver and left unmonitored was improper, dangerous and inconsistent with nationally recognized standards of care.**

A concern in this case is that Officer Tom Caver failed to properly secure Lesa Surratt in handcuffs after she was in custody, thus permitting her to escape the restraints and acquire illicit drugs that were concealed on her person. This concern is accompanied by the fact that Caver left Surratt and Garza unmonitored after they were placed in custody and after being informed that they were in possession of illicit drugs.

The record in this case shows that following Surratt's arrest, Caver placed handcuffs on her and placed her in the rear of the police vehicle. After doing so, Caver arrested Garza and also

---

[30] Autopsy Report signed by Dr. Candice Schoppe dated 10-15-13

handcuffed her and placed her next to Surratt in the rear of his vehicle. At about this same time, Officer Stevens arrived at the scene to assist Caver.

Surratt then asked Caver to retrieve a purse and shoes from her vehicle. Rather than Stevens remaining at Caver's vehicle to monitor Surratt and Garza, both Caver and Stevens went to Surratt's vehicle leaving Surratt and Garza unattended.

While Caver and Stevens were at Surratt's vehicle, Surratt was able to free one hand out of her handcuffs and retrieve a plastic bag containing cocaine from what appears to be her underpants. The record is then clear that she then placed the bag in her mouth – before either Caver or Stevens returned to Caver's vehicle.

*a. Properly securing handcuffs*: Caver clearly failed to properly attach the handcuffs to Surratt and his failure to do so not only created a potential danger to Caver and Stevens but also facilitated Surratt's ability to retrieve the bag containing illicit drugs she had concealed on her person and place it in her mouth. Not only did Caver's failure to properly affix the handcuffs to Surratt facilitate her ability to retrieve drugs but had she been armed, it would have also enabled her to attack and possibly seriously injure or even kill Caver or Stevens. Thus, Caver's failure to properly affix the handcuffs to Surratt was a gross breach of police protocol and nationally recognized standards of care.

Police officers are trained to apply handcuffs to persons that have been taken into custody. Assuming Caver was properly trained in the correct application of handcuffs, his obvious inattention to how well Surratt was secured is a concern. This is because Surratt was able to free at least one of her hands and obtain the illicit drugs she possessed. With the previous knowledge that Surratt was in possession if illicit drugs, Caver was derelict of duty in failing to ensure that Surratt's handcuffs were properly secured to prevent her from retrieving the drugs she was suspected of possessing.

The International Association of Chiefs of Police (IACP) supports this. The IACP is the nation's largest professional policing organization with over 20,000 members in over 100 countries. In 1987, the IACP entered into a cooperative agreement with the U.S. Justice Department's Bureau of Justice Assistance to establish a National Law Enforcement Policy Center. The purpose of the center was to assist law enforcement administrators across the country in the task of developing law enforcement policies that reflect nationally recognized professional practices.

A publication from the IACP's national Law Enforcement Policy Center is the Transportation of Prisoners Concepts and Issues Paper. Included in that publication are the following statements:

> "Officers must take care to apply restraints correctly and in the manner in which they were designed to be used.  Handcuffs applied slightly loosely may allow the prisoner to slip free."[31]

And,

> "Handcuffs are notoriously easy to escape from when improperly applied or when a lengthy period of time is available to the prisoner without supervision."[32]

*b. Properly monitoring arrestees*: Nationally recognized police protocols also state that once a suspect has been placed into custody, officers are responsible for their safety and therefore must

---

[31] IACP National Law Enforcement Policy Center. <u>Transportation of Prisoners</u>. Concepts and Issues Paper, dated October 1996, p. 2
[32] IACP National Law Enforcement Policy Center. <u>Transportation of Prisoners</u>. Concepts and Issues Paper, dated October 1996, p. 3

continually monitor the arrestee to safeguard not only the arrestee but any officers present as well. This is supported by IACP's *Transportation of Prisoners* Concepts and Issues Paper. Included in that publication is the following statement:

> "Prisoner transportation policies and officer training should emphasize the need for constant visual monitoring of prisoners while they are outside a secure area and wearing restraining devices."[33]

The facts in this case are clear that at the time Surratt and Garza were positioned in the back seat of Caver's vehicle, both Officers Caver and Stevens were present. At this same time, Sergeant Jeffcoat had already informed Caver that Surratt was suspected of being in possession of illicit drugs and that those drugs were concealed on her person. With this knowledge, Surratt and Garza should have never been left unattended. It is uncertain whether Surratt's request for Caver to retrieve her purse and shoes was a ruse to get the officers away from them but in any case, either Caver or Stevens should have remained at the vehicle to monitor her and Garza.

At the very minimum, Caver should have informed Stevens that Surratt was thought to be in possession of illicit drugs <u>before</u> Stevens walked with him back to Surratt's vehicle. Doing so after Stevens walked to Surratt's vehicle was too late. This is because with both officers away from Caver's vehicle, Surratt had the window of opportunity she needed to use her newly freed hand to retrieve the baggie of drugs and place it in her mouth.

Surratt should have never had the opportunity to escape her handcuffs and retrieve the concealed baggie of illicit drugs. Caver was derelict of duty by failing to properly affix the handcuffs to Surratt and by failing to properly monitor her once she was placed in the rear of his police cruiser. While Caver should have practiced both of these critical field operations, had either one of these been properly undertaken it is likely, if not certain, that Surratt would have never had the opportunity to retrieve the illicit drugs from her person and then attempt to swallow them. As such, proper actions on the part of Caver would have resulted in ensuring the personal safety of Surratt, as was his duty.

➢ *It is my opinion, stated within a reasonable degree of professional certainty, that failure on the part of Sherman Police Officer Tom Caver to properly secure the handcuffs on Lesa Surratt facilitated her attempted swallowing of illicit drugs that preceded her death. Caver's failure to properly secure Lesa Surratt's handcuffs after she was taken into custody was improper, unprofessional and inconsistent with nationally recognized standards of care in professional policing.*

➢ *It is my opinion, stated within a reasonable degree of professional certainty, that failure on the part of Sherman Police Officer Tom Caver to properly monitor Lesa Surratt after she was handcuffed, facilitated her attempted swallowing of illicit drugs that preceded her death. Caver's failure to properly monitor Lesa Surratt after she was taken into custody was improper, unprofessional and inconsistent with nationally recognized standards of care in professional policing.*

**II. Defendant Officers Caver and Stevens failed to properly search Lesa Surratt for drugs or contraband before securing her in the police vehicle.**

It is also a concern that before placing Surratt and Garza into his police vehicle, Officer Caver failed to search either one for weapons and drugs. Failing to do so was dangerous, reckless and inconsistent with nationally recognized policing standards of care.

---

[33] IACP National Law Enforcement Policy Center. <u>Transportation of Prisoners</u>. Concepts and Issues Paper, dated October 1996, p. 1

In this case, the record shows that a drug investigation was being conducted by Jeffcoat and McClaran that focused on Lesa Surratt who was suspected of possessing illicit drugs. Jeffcoat and McClaran received information from an informant that Surratt was in possession of drugs and that she was seen associating with a known drug dealer, Ernest Quincy Williams.

It appears as though Jeffcoat and McClaran had sufficient reason to believe that Surratt was in possession of drugs. This fact is critical, especially as it related to Caver's stop of her. It is concerning, however, that the operational plan to recover the suspected drugs from Surratt's person was for Caver to arrest her and then take her to the police station where she would then be search for the drugs.

Jeffcoat and McClaran's plan to wait to search Surratt was clearly shortsighted and caused Officer Caver and Stevens to be placed potentially (and unnecessarily) in harm's way. This is because, nationally recognized policing practices and procedures are clear that prisoners must be searched for weapons and contraband before being transported. This is especially so considering Surratt was already thought to be in possession of illicit drugs. There is no information in the case record that this ever occurred.

Instead of waiting for Surratt to be transported to the Police station to be searched, Jeffcoat and McClaran could and should have had as part of their operational plan to have a female officer or police department employee, present at the site of the arrest to search Surratt and Garza. Had this occurred, the baggie of illicit drugs would have likely been located and seized. This would have then made it impossible for Surratt to retrieve the baggie and attempt to swallow it.

The standards for properly searching arrestees at the time of arrest are clear and identified by the IACP. They state for example,

> "Once the arrestee is completely secured and out of reach from both victims and the public, officers should (if they have not already done so) conduct a thorough search of the person for weapons and contraband. Whenever possible, all searches that are conducted incident to arrest should be performed by an officer of the same gender as the arrestee…The search incident to arrest should include not only the person of the arrestee, but also areas within the reach and control of the arrestee."[34]

The IACP further states,

> "Before being transported, all arrestees must be searched thoroughly for any weapons or contraband. Transporting officers, like arresting officers, are responsible for the well-being of arrestees. As part of this requirement, and for their own protection, transporting officers should search the arrestee regardless of any prior searches that may or may not have been conducted by the arresting officers."[35]

Officer Caver was requested by Jeffcoat and McClaran to facilitate the traffic stop of Surratt. As such, Caver was working at the direction of Jeffcoat and McClaran. That said, Officer Caver must assume some responsibility for the stop as he was the traffic officer and was responsible for how it was conducted. In spite of Jeffcoat and McClaran's operation plan to have Surratt searched at the police station, Caver should have informed them that a failure to search Surratt and Garza at the scene of the arrest was dangerous and reckless. Thus, a female officer should have been contacted and made available pursuant to the stop. Based on the record, there was sufficient time for this contingency to be put into place because Jeffcoat and McClaran stated that they observed Surratt for a period of time before she exited Whitney's Grocery Store.

---

[34] The International Association of Chiefs of Police, National Law Enforcement Policy Center, Arrests: Concepts and Issues Paper. August 2010, p. 6

[35] The International Association of Chiefs of Police, National Law Enforcement Policy Center, Arrests: Concepts and Issues Paper. August 2010, p. 6

Officer Caver failed to inform Stevens on a timely basis that Surratt was the subject of a drug investigation and that she was believed to be concealing drugs in her underwear at the time she was arrested. In addition to Caver's responsibility to do so, this responsibility should be shared with McClaran who not only was in charge of the investigation but also had personal knowledge of the information regarding Surratt.

Moreover, because it was McClaran (assisted by Jeffcoat) who summoned Caver to assist them in arresting Surratt, McClaran could and should have exercised some supervisory responsibility in (1) ensuring Surratt was properly searched before being placed in the patrol vehicle; (2) ensuring there were backup officers available to assist Caver and who were also aware that Surratt was suspected of "holding" illicit drugs, and (3) ensuring that a female officer was available on a timely basis for the purpose of searching Surratt before she was placed in Caver's patrol vehicle. There is nothing in the materials provided to me that suggests that McClaran took any such supervisory actions over the very drug operation he initiated.

Lesa Surratt should have been searched at the scene of her arrest – before being placed in the police vehicle. Considering Jeffcoat and Stevens were aware that the suspects to be stopped were female and considering there was ample time to have additional officers present (including a female officer or police employee) there is no reason this should not have occurred. This is so not only because it is an officer safety issue but it is the duty of officers to protect the well-being of those who are in their custody.

➢ *It is my opinion, stated within a reasonable degree of professional certainty, that the failure on the part of Officers Jeffcoat, McClaran and Caver to require Lesa Surratt and Monica Garza to be searched for weapons and illicit drugs while at the scene of their arrest was dangerous, reckless and inconsistent with nationally recognized policing procedures and standards of care.*

➢ *It is my opinion, stated within a reasonable degree of professional certainty, that Brian McClaran failed to properly supervise his drug operation that focused on Lesa Surratt. Had McClaran properly supervised the traffic stop of Surratt, it is likely, if not certain, that Surratt would have never had an opportunity to attempt to swallow the baggie of drugs that was later responsible for her death.*

**III. The forceful pressure techniques used by Officers Caver and Stevens to restrict Lesa Surratt's ability to swallow was excessive, unnecessary and unreasonable under the circumstances.**

In this case, it is undisputed that Lesa Surratt died as a result of suffocation from the baggie she was attempting to swallow. It is also uncontested that it was realized that Surratt was attempting to swallow something, both Caver and Stevens responded with force that was designed to thwart her ability to swallow. What is uncertain, however, is the extent to which Caver's and McClaran's use of force against Surratt caused the baggie she was attempting to swallow to lodge in her throat. Any action taken by a police officer to restrict an arrestee's ability to breathe (chokeholds, pressure points, etc.) is potentially life threatening. Anything short of an officer taking such actions to protect his or her life or the life of an innocent citizen can reasonably be considered a use of deadly force and is therefore improper.

The record shows, for example, that after he saw Surratt chewing something Caver utilized a pressure point technique where he placed one of his fingers at the junction of Surratt's lower jaw and neck, in an attempt to make her open her mouth and spit the item out. Stevens stated that upon realizing Surratt had something in her mouth, Caver used his left thumb to apply pressure to

the right side of Surratt's jaw and when she moved her head away from Caver, Stevens placed his forearm along the left side of Surratt's neck and head to restrict movement.[36]

The actions of Caver and Stevens in this regard are concerning because although it was apparent that Surratt was attempting to swallow drugs, utilizing physical pressure on her neck to keep her from swallowing was dangerous, reckless and unnecessary. This is because a reasonable officer would know that whatever Surratt was attempting to swallow would likely be lodged in her throat once pressure techniques were utilized.

This is supported by the patrol vehicle video provided in this case. The video shows Garza seated to the right-hand side of Surratt in the back of the patrol vehicle. Garza asked Caver to retrieve her purse and Surratt asked that he retrieve her purple cigarette case. Once the officers left the presence of Garza and Surratt, Surratt's arms come around from behind her and she then retrieves something from what appears to be the front part of her crotch area. She then places the item into her mouth just as Stevens returns to the vehicle.

It is instructive that the patrol vehicle video is clear that once Caver and Stevens begin to attempt to exert pressure Surratt's throat, she can still be heard speaking to them. This is evidence that the item that ultimately lodged in her throat (baggie) was still in her mouth at the time of the struggle, as Surratt was still in the vehicle and had not yet been swallowed. Had Caver and Stevens not applied the pressure to Surratt's neck and throat to restrict or otherwise complicate her ability to swallow, it is likely that she would have successfully swallowed the baggie, which could have been subsequently retrieved for evidentiary purposes.

An officer's use of force is governed by departmental policy as well as nationally recognized standards of care. For example:

***Constitutional standards: Use of force***: The standard of care for law enforcement use of force is identified in U.S. Supreme Court case *Graham v. Connor, 490 U.S. 396 (1989)*. This case established the "objectively reasonable" standard under the Fourth Amendment, which means that the reasonableness of an officer's use of force must be reasonable and judged "from the perspective of a reasonable officer at the scene." The professional literature in professional policing explains the term "objectively reasonable." For example,

> "This term means that, in determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to the community."[37]

The "reasonable man," or more accurately, reasonable officer standard identified in the Graham decision is an objective test. That is, it is not based on the intent or motivation of the officer or other subjective factors at the time of the incident. It is based solely on the objective circumstances of the event and the conclusion that would be drawn by any "reasonable officer at the scene."

***Professional policing guidelines (IACP): Use of force***: In addition to the constitutional standards discussed above, professional literature in policing and police training guides address the appropriate use of force under different circumstances. One authoritative source of professional literature is the International Association of Chiefs of Police (IACP).

The IACP is the nation's largest professional policing organization with over 20,000 members in over 100 countries. In 1987, the IACP entered into a cooperative agreement with the U.S. Justice

---

[36] Office of Professional Standards Internal Affairs Custodial Death Investigation: Interview of Caver by Oliver and Cox, p. 5 of 35

[37] International Association of Chiefs of Police National Law Enforcement Policy Center (2006). Use of Force. February

Department's Bureau of Justice Assistance to establish a National Law Enforcement Policy Center. The purpose of the center was to assist law enforcement administrators across the country in the task of developing law enforcement policies that reflect nationally recognized professional practices.

A publication from the IACP's national Law Enforcement Policy Center is the Use of Force Model Policy and Concepts and Issues Paper published in 2006. Included in that publication are the following:

They also state:

> "…officers use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others…The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances."[38]

Instead of forcefully restricting Surratt's ability to swallow, Caver and Stevens should have either permitted her an opportunity to spit it out or, in the extreme, allow her to swallow it. In the latter case, Surratt could have been transported to the hospital for a stomach pump or in the extreme case, incarcerate her while being monitored by a female officer and allow her to pass the item in her fecal matter.

In any case, the actions taken by Caver and McClaran to restrict her ability to swallow were unreasonable. This is because other more reasonable actions were available that were ignored. Moreover, Caver and McClaran's actions were clearly designed to restrict Surratt's ability to breathe and were therefore tantamount to undertaking a medical procedure for which the officers were not trained. In fact, a reasonable officer acting with the same information Caver and Stevens were aware of would perceive such actions as a use of deadly force. Because Surratt was not posing a deadly threat to anyone at the time, any use of deadly force against her was unreasonable.

Had Caver and Stevens not employed pressure tactics against Surratt's throat, it is likely that she would have either spit the item out or would have simply swallowed it – to be recovered at a later time using a proper medical procedure and properly trained medical personnel.

> ➢ *It is my opinion, stated within a reasonable degree of professional certainty, that the use of force by Sherman Police Officers Caver and Stevens in applying pressure to Lesa Surratt's neck and throat was dangerous, reckless and unnecessary under the circumstances. Caver's and Steven's actions were tantamount to a medical procedure for which they were not trained and likely contributed to the lodging of the baggie in Surratt's throat. The actions of Caver and Stevens were excessive, inconsistent with nationally recognized standards of care and served no objectively reasonable purpose.*

**IV. The Sherman Police Department failed to properly establish written directives addressing the use of applying pressure to the neck and throat areas of drug suspects attempting to swallow contraband or drugs.**

Another concern in this case is what appears to be an absence of key policies and procedures addressing the application of force against a suspect who is attempting to swallow drugs or contraband. My review of the Sherman Police Department Use of Force Policy and Procedure Number 3.01 reveals no reference to the techniques used by Caver and Stevens against Surratt. Had policy makers established written directives addressing this it is likely that the officers would have know that doing so was dangerous, reckless and unreasonable.

---

[38] International Association of Chiefs of Police National Law Enforcement Policy Center (2006). Use of Force. February

Properly written police policy is an extension of officer training. This is especially so with regard to police actions and procedures that involves use of force and use of deadly force. Therefore, a properly written policy should reflect not only the applicable law but also officer important provisions of officer training. This is especially so as it relates to those actions that may result in the serious injury or death of a subject, such as the restricting of a suspect's ability to breathe.

While the use of pressure points is intended to be a pain-compliance technique, depending on the circumstances, such techniques can be the equivalent to deadly force when used in a situation where the officer knows the subject's ability to breathe my be impaired and thus sustain serious physical injury or death. That was the case in this matter. Failure to include policy provisions addressing chokeholds and pressure points techniques intended to restrict an arrestee's ability to breathe constitutes a failure to provide crucial supervision, direction and training relating to a potentially deadly field action.

Properly written policies and procedures provide operational guidance in the field and also reflect and reinforce officer training. The International Association of Chiefs of Police (IACP) identifies the importance of properly written policies. They state that the essential functions of policy and procedures include,

> "[Policies] inform officers of what is expected of them in the performance of their duties, provide guidance to them in performing such duties, and establish the basis for employee accountability and the means to fairly evaluate officer and unit performance."[39]

And,

> "Procedures should provide officers with the details of how to proceed with a given task, assignment, or situation, and what should and should not be done in certain circumstances."[40]

They further state,

> "Training materials should be built upon and consistent with agency policies, procedures and rules. They are a key link in bringing more definition and direction to policies and procedures and are therefore also part of the overall written directive system."[41]

These statements make it clear that properly written policies and procedures are crucial in providing operational guidance for officers – especially for those practices where citizens are subjected to force by law enforcement and where constitutional rights might be placed in jeopardy. Officers Caver and Stevens both applied pressure to Lesa Surratt's neck and throat with the intention of restricting he ability to breathe but the Sherman Police Department failed to establish operational guidelines addressing such actions. Such an oversight constitutes a gross indifference to the safety and welfare of the citizens of Sherman, Texas – the very citizens the police are sworn to protect.

> ➤ *It is my opinion, stated within a reasonable degree of professional certainty, that administrators within the Sherman Police Department failed to establish written directives that prohibit the application of pressure to the neck and throat areas of arrestees who have attempted to swallow drugs. The establishment of such a policy would have resulted in Officers Caver and Stevens not using pressure on Surratt's throat and taking advantage of alternative actions to retrieve the drugs she was attempting to swallow.*

This concludes my report at this time.

---

[39] International Association of Chiefs of Police National Law Enforcement Policy Center (2002). <u>Written Directive System</u>. October. p. 1
[40] International Association of Chiefs of Police National Law Enforcement Policy Center (2002). <u>Written Directive System</u>. October. p. 3
[41] International Association of Chiefs of Police National Law Enforcement Policy Center (2002). <u>Written Directive System</u>. October. p. 3

**Fees and Previous Experience**

This report contains the opinions I am prepared to express at trial in this matter. My fees in this case are at the rate of $200 per hour and an initial retainer of $4000. I charge $2350 per day plus expenses for depositions and any work conducted out of town.

I have testified as an expert witness on 171 occasions including hearings, depositions and trials. Those that have occurred during the past four years are listed in Appendix #2.

Respectfully submitted,

Michael D. Lyman, Ph.D.
December 27, 2014

## APPENDIX #1 – MATERIALS REVIEWED

1.  Complaint
2.  Fire Department EMT Report
3.  Office of Professional Standards Internal Investigation 2013-032 Custodial Death Investigation Lesa Surratt report
4.  DPS Investigation docs: Caver and Stevens video interview; Garza video interview; McClaran and Jeffcoat video interview; Radio traffic; misc. photos
5.  Patrol vehicle video (front & secondary)
6.  Video of scene (2)
7.  Private investigation audio file
8.  SPD Use of Force policy
9.  International Association of Chief's of Police (IACP), Use of Force: Model Policy, February, 2006
10. International Association of Chief's of Police (IACP), Use of Force: Concepts and Issues Paper: Originally published: February 2006
11. The International Association of Chiefs of Police, National Law Enforcement Policy Center, Arrests: Concepts and Issues Paper. August 2010.
12. IACP National Law Enforcement Policy Center, Arrests, Model Policy, August 2010.
13. IACP National Law Enforcement Policy Center. Written Directive System. Model Policy, dated April 2002
14. IACP National Law Enforcement Policy Center. Written Directive System. Concepts and Issues Paper, dated October 2002
15. IACP National Law Enforcement Policy Center. Transportation of Prisoners. Concepts and Issues Paper, dated October 1996
16. Graham v. Connor, 490 U.S. 396 (1989)

## APPENDIX #2 – EXPERT TESTIMONY

Depositions given in last four years:

1.  Daniel Thompson and Cathy A. Thompson vs. Wendell Hall et. al. Case No.: 3:08-cv-63/WS/MD in the United States District Court Northern District of Florida, Pensacola Division
    For Plaintiff
    Use of force/Internal affairs/Supervision
    Deposition: 1/11

2.  Patricia Hagans vs. Franklin County Sheriff's Office, et. al., Case No. 2:08-CV-850; In the United States District for the Southern District of Ohio Eastern Division
    For Plaintiff
    Use of force
    Deposition: 2/11

3.  Ueketta Jimerson v. Village of Skokie and Detective Will Zahn; 08 L 4824, Cook County Circuit Court
    For Defense
    Investigative procedures / eyewitness identification
    Deposition: 3/11

4.  Ronald L. Huntley v. City of Owasso, et. al. 10-CV-017 JMP-FHM; In the United States District Court for the Northern District of Oklahoma
    For Plaintiff
    Use of force
    Deposition: 4/11

5.  Lindquist v. Sheriff Grayson Robinson, et. al.; Civil Action No. 10-cv-02264-REB-MEH; In the United States District Court or the District of Colorado
    For Plaintiff
    Use of force
    Deposition: 7/11

6.  Jesse Dupris and Jeremy Reed v. United States of America, et. al. No. CV08-8132-PCT-PGR; CV08-8133-PCT-PGR; In United States District Court, District of Arizona
    For Plaintiff
    Investigative process/arrest
    Deposition: 7/11

7.  James I. Huebner v. Brad D. Ware, et. al., Case No. 09-CV-1295 IN the State of Wisconsin Circuit Court Branch 10, Dane County
    For Plaintiff
    Vehicle stops/Use of force
    Deposition: 9/11

8.  Katherine L. Russell vs. Christopher Davis, et al., Case No. 4:10-cv-2179; In The United States District Court For The Northern District Of Ohio Eastern Division
    For Plaintiff
    Vehicle stops/Pat down search
    Deposition: 11/11

9.    Brandon v. Moore, et. al., Case No. 11-CV-178-CVE-TLW; United States District Court, Northern District of Oklahoma
         For Plaintiff
         Vehicle stops/Arrest/Use of Force
         Deposition: 11/11

10.   David Lee Nall et. al., v. City of Painesville, et. al., 1:10 cv-02883 in the United States District Court for the Northern District of Ohio Eastern Division
         For Plaintiff
         Vehicle stops/Arrest/Use of Force
         Deposition: 11/11

11.   Darryl Burton v. City of St. Louis, Missouri, et. al.; No. 4:10-CV-01540-TCM: In the United States District Court Eastern Division of Missouri, Eastern Missouri
         For Plaintiff
         Criminal Investigation/lineups/informants
         Deposition: 12/11

12.   Laurie Peabody, et. al. vs. Perry Township, Ohio, et. al. Case No 2:10-cv-1078 In the United States District Court Southern Division of Ohio Eastern Division
         For Plaintiff
         Patrol stops; Taser; Use of force
         Deposition: 12/11

13.   Galbreath v. Maser, et. al.; Case No: 0916-CV34709; In the Circuit Court of Jackson County, Missouri at Kansas City
         For Plaintiff
         Use of force
         Deposition: 1/12

14.   Michelle Stogner v. Chris Sturdivant, et al. Civil Action No.: 10-Cv-125; In the United State District Court Middle District Of Louisiana
         For Plaintiff
         Use of force
         Deposition: 1/12

15.   Rehberg V. Pueblo, Et Al, Civil Action No. 10-Cv-0261-LTB; In The United States District Court For The District Of Colorado
         For Plaintiff
         Arrest/Use of force
         Deposition: 2/12

16.   Joseph M. Ramos Sr. as Administrator v. Jared White, Scott Brooks and the Town of Dartmouth; United States District Court for the District of Massachusetts; Civil Action No. 1:09 CV 11649 NG
         For Plaintiff
         Investigative stop/Use of deadly force
         Deposition: 3/12

17.   Paul O'Grady, et. al., v. City of Ballwin, MO et. al.; Case No. 4:10CV01707 in the United States District Court of Eastern District of Missouri, Eastern Division
         For Plaintiff
         Suicide response/foreseeability/involuntary commitment
         Deposition: 3/12

18.     Russell Gregory III, in his capacity as Personal Representative of the Estate of Mary Fisher,
        and in his Capacity as Guardian of Ashley Keiko Gregory, a Minor, the heir of Mary Fisher,
        deceased, Russell Gregory, III vs. City of Memphis, Officer Patrick Taylor, No. 07-02445
        SHM-sta; In the United States District Court for the Western Division of Tennessee at
        Memphis;
            For Plaintiff
            Suicide Police supervision; mental illness; traffic stops
            Deposition: 5/12

19.     Valerie Walker, Personal Representative for Estate of Andre Walker v. Cumberland County
        Hospital System, Inc., et. al. In the General Court of Justice Superior Court Division NO 11
        CVS 8357 (North Carolina)
            For Plaintiff
            Use of force
            Deposition: 6/12

20.     Hale v. City of Martinsburg, et. al.; Civil Action No. 3:11-CV-78; United States District Court
        for the Northern District of West Virginia
            For Plaintiff
            Use of force
            Deposition: 9/12

21.   John Boynton v. Jeff Wishard et. al., Case 2:10-cv-04179-NKL: In the United States District
      Court for the Western District of Missouri Central Division
          For Plaintiff
          Malicious prosecution
          Deposition: 9/12

22.   Edith Lynn Marques, et. al. vs. Pima County Sheriff Clarence W. Dupnik, et. al. No. C2011
      8159 in the Superior Court of the State of Arizona in and for the County of Pima
          For Plaintiff
          Pursuit
          Deposition: 12/12

23.   Lisa Herrera as Personal Representative of the Estate of Rudolfo R. Lucero, Deceased, v.
      City of Roswell; Robert Smith; Eric Brackeen and John Meredith a/k/a Jon Meredith; Cause
      No. CIV-11-00848 CG/KBM; In the United States District Court of New Mexico
          For Plaintiff
          Use of Deadly Force
          Deposition: 1/13

24.   Charles F. Foltz v. Jeff Wood et. al.; Case No. 2:11-CV-2252-PKH; in the United States
      District Court for the Western District of Arkansas Fort Smith Division
          For Plaintiff
          Arrest/Use of Force
          Deposition: 1/13

25.   Re: John Harmon and Stephanie Harmon v. Hamilton County, Ohio, et. al. Case No. 1:10-cv-
      911; in the United States District Court Southern District of Ohio Western Division Cincinnati
          For Plaintiff
          Arrest/Use of Force
          Deposition: 3/13

26. Patrick Williams, etc., v. City of Midfield, Alabama, et. al., Civil Action No. CV-2010-900265; WCOP Matter, No.: 027318-0001
   For Plaintiff
   Police pursuit
   Deposition: 3/13

27. Jason Friday vs. Keli Theison, et. al. Case No. 1016-CV3792, Division 18 In the Circuit Court of Jackson County, Missouri at Kansas City.
   For Plaintiff
   Search and seizure / Deadly force
   Deposition: 3/13

28. Family Serv. Assoc. of Steubenville, Ohio, etc, et. al. v. Wells Township, et. al.; United States District Court, Southern District Case No. 2:12-CV-135
   For Plaintiff
   Investigative detention/Arrest/Safety of Arrestees
   Deposition: 5/13

29. Melissa Standifer v. Jacob Lacon, et. al., Case No. 1:11-Cv-0293 in The United States District Court For The Southern District Of Ohio Western Division
   For plaintiff
   Custody/Safety of Arrestees/nonconsensual committal
   Deposition: 5/13

30. Ladonna L. Sanders versus City of Grandview, Missouri; Case No: 4:12-CV-01069-GAF, in the United States District Court for the Western District of Missouri Western Division
   For plaintiff
   Arrest/Use of force
   Deposition: 7/13

31. Connie Berry, Individually and as Administrator of the Estate of Eric Berry, Plaintiff, v. Brandon Davis as individual et. al., Defendants; Case No. 12-2269 - in the United States District Court for the Western District of Arkansas
   For plaintiff
   Arrest/Use of force
   Deposition: 10/13

32. Ty Evans v. Frank Poston et. al., No. 1:07-CV-0592-DFH-JMS; In the United States District Court for the Southern District of Indiana
   For plaintiff
   Use of force
   Deposition: 11/13

33. Cause No. 2:13cv105; Elizabeth Lawson v. Marion County, Texas, et. al., In the United States District Court for the Eastern District of Texas – Marshall Division
   For plaintiff
   Use of force
   Deposition: 12/13

34. Brandon M. Cook v. Joe Peters, et. al., Case No. 13CV107GKF-FHM; In the United States District Court for the Northern District of Oklahoma
   For plaintiff
   Use of force
   Deposition: 12/13

35. Estate of Patrick Burns v. Neil Williamson, et. al. Case No.: 3:11-cv-03020-SEM-BGC; in the United States District Court for the Central District of Illinois Springfield Division
    For plaintiff
    Use of force
    Deposition: 4/14

36. Carolyn Chaudoin, Adm' x of Estate of Thomas E. Ferguson v. Larue Co., et. al., USDC, Western District of KY at Louisville, Civil Action No. 3:13CV-472-CRS
    For plaintiff
    Use of deadly force
    Deposition: 5/14

37. Leonard Robinson, Jr. v. City of Chicago, a municipal corporation, Detective Vincent Humphrey; Civil Action No.: 08 L 3323; In the Circuit Court of Cook County, Illinois County Department – Law Division
    For defense
    Probable cause / arrest
    Deposition: 5/14

38. Rebecca Van Hooser v. Town of Pantego, Texas and Eric Alvarez; Civil Action No. 4:12-cv-810-BJ; In the United States District Court for the Northern District of Texas Fort Worth Division
    For plaintiff
    Probable cause / arrest
    Deposition: 7/14

39. Jermaine Lacy v. Col. Richard Gray, et. al., Case No. 4:13-CV-00370-RWS; in the United States District Court Eastern District of Missouri Eastern Division
    For plaintiff
    Use of force
    Deposition: 8/14

40. Douglas L. Jones et. al. vs. City of Carthage, Missouri, et. al. Case No. 13-5067-CV-SW-DW In The United States District Court Western District Of Missouri Southwestern Division
    For plaintiff
    Arrest / Probable cause / Failure to provide medical assistance
    Deposition: 9/14

41. Ebony Pratt, Individually And As Representative of the Estate Of Wayne Pratt, Deceased vs. Harris County, et. al., C.A. No. 4:12-CV-01770; in the United States District Court for the Southern District of Texas Houston Division
    For plaintiff
    Arrest / Use of force
    Deposition: 10/14

42. Tina Cline, Administratrix of the Estate of Donald W. Cline vs. The County Commission of Berkeley County, Chris Cochran, Primecare Medical of West Virginia Incorporated, Sandra Parker and the West Virginia Regional Jail and Correctional Facility Authority; Case No. 11-C- 584; in the Circuit Court for the County of Berkeley, West Virginia
    For plaintiff
    Arrest / Failure to provide medical case
    Deposition: 11/14

43. David Roberts vs. The City of Omaha, et. al.; 8:11cv-129 in the United States
    District Court for the District of Nebraska
    For plaintiff
    Arrest / Use of deadly force / Responding to mentally ill
    Deposition: 12/14

44. Tommy Braden v. John Davis, et. al. Case No.: 13-CV-693-GKF-FHM; In the United
    States District Court for the Northern District of Oklahoma
    For plaintiff
    Arrest
    Deposition: 12/14

Hearings in last four years:

1. State of Alaska vs. Alfred John Minder. Case No. 4FA-13-425 CR: In the District Court for the
   State of Alaska Fourth Judicial District
   For defense
   Traffic Stop/Arrest
   Administrative Hearing: 5/13

2. State of Alaska vs. Alfred John Minder. Case No. 4FA-13-425 CR: In the District Court for the
   State of Alaska Fourth Judicial District
   For defense
   Traffic Stop/Arrest
   Suppression Hearing: 7/13

3. State of Alaska vs. Alfred John Minder. Case No. 4FA-13-425 CR: In the District Court for the
   State of Alaska Fourth Judicial District
   For defense
   Traffic Stop/Arrest
   Suppression Hearing: 10/13

Trial testimony in last four years:

1. Robert Brewer Plaintiff vs. Ed Rodgers, et. al; United States District Court, Eastern District Of
   Kentucky Central Division at Lexington; Civil Action No. 5:08-23
   For Plaintiff
   Use of deadly force
   Trial date (3rd trial): 11/10

2. Tracy Watson, Renee Stalker, Pam Stalker, Guardian ad litem for minors v. County of Santa
   Clara, et. al. Case No. C06-4029 RMW In the United States District Court Northern District of
   California San Jose Division
   For Plaintiff
   Investigative procedures
   Trial: 3/11

3. Ueketta Jimerson v. Village of Skokie and Detective Will Zahn; 08 L 4824, Cook County
   Circuit Court
   For defense
   Investigative procedures/Arrest/Probable cause
   Trial: 2/12

4.  Steve C. Thornton and Judith E. Thornton v. Thomas Carpenter, et. al., In the United States District Court for Southern District of Mississippi, Cause No. 3:09 cv 323 HTW-LRA
    For Plaintiff
    Arrest / Investigative detention / Use of force
    Trial: 7/12

5.  Jacob Rush, individually and as administrator of the estate of Gilbert Rush Jr., et. al. v. City of Mansfield, Ohio, et. al. Civil No. 1:07-cv-01068. In the United States District Court Northern District of Ohio Eastern Division
    For Plaintiff
    Raid planning / Use of deadly force
    Trial deposition: 10/12

6.  Edith Lynn Marques, et. al. vs. Pima County Sheriff Clarence W. Dupnik, et. al. No. C2011 8159 in the Superior Court of the State of Arizona in and for the County of Pima
    For Plaintiff
    Police pursuit
    Trial: 1/13

7.  Salanitro v. Altiere, Wheaton, and Washington County; United States District Court Case No. 3:11-CV-1051-S1
    For Plaintiff
    Use of Deadly Force / Arrest
    Trial: 2/13

8.  James I. Huebner v. Brad D. Ware, et. al., Case No. 09-CV-1295 IN the State of Wisconsin Circuit Court Branch 10, Dane County
    For Plaintiff
    Motor vehicle stops/Use of force
    Trial: 4/13

9.  Ty Evans v. Frank Poston et. al., No. 1:07-CV-0592-DFH-JMS; In the United States District Court for the Southern District of Indiana
    For plaintiff
    Use of force
    Trial: 11/13

10. Elizabeth Lawson v. Marion County, Texas, et. al; Cause No. 2:13cv105;., In the United States District Court for the Eastern District of Texas – Marshall Division
    For plaintiff
    Use of force
    Trial: 2/14

11. Leonard Robinson, Jr. v. City of Chicago, a municipal corporation, Detective Vincent Humphrey; Civil Action No.: 08 L 3323; In the Circuit Court of Cook County, Illinois County Department – Law Division
    For defense
    Criminal investigation / arrest
    Trial: 11/14

**APPENDIX #3 - CURRICULUM VITAE: MICHAEL D. LYMAN, PH.D.**

**CURRENT POSITION**

Business address:       Columbia College of Missouri
                        1001 Rogers Street
                        Columbia, MO 65203
                        Office (573) 875-7472

Residence:              3703 Hunter Valley Drive
                        Columbia, MO 65203

                        Cellular: 573.268.4224

**Rank:**               Professor of Criminal Justice
                        Service from: August 1989 to Present

**Responsibilities:**

• Graduate Coordinator: Master of Science of Criminal Justice degree program
• Developed the curriculum for the Master of Science in Criminal Justice (MSCJ) program
• Developed curriculum for Bachelor of Science of Forensic Science degree program
• Former department chairman from 1989-2001
• Undergraduate courses taught include Introduction to Criminal Justice; Policing in America;
  Criminal Investigation; Management of Criminal Justice Agencies. Graduate courses taught
  include: Development of Standard Operating Procedure; Policy Development and Evaluation;
  Current Issues and Future Directions in Criminal Justice

**PREVIOUS EMPLOYMENT**

**General Background:**

As a law enforcement officer I have participated in over 600 felony arrests and testified in over
250 criminal trials and hearings. I also regularly sat on shooting and disciplinary boards and
served as lead investigator in numerous internal affairs investigations.

I have also been the lead investigator in cases involving numerous crimes. These include but are
not limited to: murder, extortion, arson, drug trafficking, corruption, rape, burglary, robbery,
assault, organized crime investigations. In this capacity I have developed and managed
informants, worked with witnesses, victims, newspaper reporters, federal agencies and working
undercover in criminal investigations. Duties have included surveillance operations; interviews of
witnesses; interrogations of suspects; arrests; searches & seizures, etc.

**Certified Generalist Instructor - The University of Missouri-Columbia**

                        Law Enforcement Training Institute - School of Law
                        321 Hearnes Center
                        Columbia, Missouri  65211
                        From - 7-15-86 to 8-15-89

*Responsibilities*:     Instructed police office recruits in police academy in the
                        areas of criminal investigation, interviews & interrogations,
                        informant management, use of force, felony arrests,
                        professional ethics Police academy program
                        coordinator keynote speaker at academy graduations

policereview@gmail.com

**The Oklahoma Bureau of Narcotics and Dangerous Drugs (state police bureau)**

4545 North Lincoln Blvd.
Oklahoma City, Oklahoma  73102
<u>Position</u> –Criminal Investigator

*Responsibilities*:    Originated and managed large-scale criminal investigations
throughout the State of Oklahoma; testified in criminal court
on both the federal and state level; made arrests; served
search warrants; conducted interrogations; served on
personnel hiring boards; disciplinary boards; shooting review
and promotion boards; conducted background investigations
of prospective recruits and conducted numerous internal
affairs investigations as Sr. investigator; testified in two
congressional hearings.

I also served as training and field training officer (FTO) for new
recruits for over four years.

From - 10/1/81 to 7/9/86

**The Kansas Bureau of Investigation (state police investigative bureau)**

1620 Tyler
Topeka, Kansas  66612
<u>Position</u> –Criminal Investigator

*Responsibilities*:    Originated and managed large-scale criminal investigations
throughout the State of Kansas; testified in criminal court on
both the federal and state level; made arrests; served search
warrants; conducted interviews and interrogations; conducted
numerous internal affairs and pre-employment background
investigations.

From - 6/75 to 10/80

**Agent – City County Investigative Squad (Johnson County, Kansas)**

Johnson County Courthouse, Olathe, Kansas (Kansas City
Metro Area) Task Force concept utilizing officers on loan
from 13 jurisdictions. This unit is no longer in existence as it
operated on grant money which was depleted during the
early 1980s.
<u>Position</u> –Criminal Investigator (civilian)

*Responsibilities*:    Initiated full-scale criminal investigations at the direction of
the unit Manager; enforced the laws of the State of Kansas; assisted in
conducting arrests and serving search warrants; developed and
managed informants; testified in criminal hearings and trials; conducted
interviews and interrogations.

From - 6/74 to 6/75

**Visiting Professor – University of Oklahoma**

Norman, Oklahoma
From 1986-1989

In this capacity I was brought to Oklahoma three times each year (December, May and August intercessions) for a period of nine years to teach courses in the law Enforcement Administration Program.

## PUBLICATIONS

**Textbooks:**

1. Lyman, M. D. & G. W. Potter (2015). Organized Crime, 6th ed . Prentice Hall: Upper Saddle River, NJ

2. Lyman, M. D. (2014). Criminal Investigation: The Art and the Science, 7th ed. Prentice Hall: Upper Saddle River, NJ.

3. Lyman, M. D. & G. W. Potter (2014). Drugs in Society: Causes, Concepts and Control, 7th ed. Elsevier/Anderson Publishing: Cincinnati, OH. (Released September 2013)

4. Lyman, M. D. (2013). Criminal Investigation (Justice Series). Pearson Education: Columbus, OH.

5. Lyman, M. D. (2010). The Police: An Introduction, 4th ed. Prentice Hall: Upper Saddle River, NJ. Fourth Edition due out in May 2009.

6. Lyman, M. D. (2007). Practical Drug Enforcement, 3rd ed. CRC Press: Boca Raton, FL

7. Lyman, M. D. (1989). Gangland: Drug Trafficking by Organized Criminals. Springfield, IL: Charles Thomas Publisher

8. Lyman, M. D. (1987). Narcotics and Crime Control. Springfield, IL: Charles Thomas Publisher

**Articles / Essays:**

Lyman, M. (2005). "Drug Enforcement in the United States." An essay for The Encyclopedia of Law Enforcement, Sage Publications: Thousand Oaks, CA.

Lyman, M. (2005). "Undercover Operations." An essay for The Encyclopedia of Law Enforcement, Sage Publications: Thousand Oaks, CA.

Lyman, M. (2004). The Decision to Chase: Revisiting Police Pursuits and the appropriateness of Action. The Police Forum Journal.

Lyman, M. (2004). "Transnational Organized Crime." An essay for The Encyclopedia of Murder & Violent Crime; Eric Hickey Editor. Sage Publications: Thousand Oaks, CA.

Lyman, M. (2004). "Domestic Organized Crime." An essay for The Encyclopedia of Murder & Violent Crime. Sage Publications: Thousand Oaks, CA.

## AWARDS

- 2004 Community Partner Award presented by the Columbia Missouri Police Foundation, February 2004.

- Police Instructor of the Year Award presented by the Missouri Department of Public Safety, Peace Officer's Standards and Training (POST). Presented April 1989.

- Meritorious Award for Independent Study Course presented by the National University Continuing Education Association. April 1989.

## ACADEMIC BACKGROUND

- Doctor of Philosophy (1992) Higher and Adult Education and Foundations. University of Missouri-Columbia, Columbia, Missouri

- Master of Science in Administration of Justice – Police Agency Management (1979) Wichita State University Graduate School, Wichita, Kansas

- Bachelor of Science in Administration of Justice (1977) Wichita State University, Wichita, Kansas

- Successfully completed 16-hour Taser Instructor course in April 2009

## CONSULTING

- I have been practicing as an expert witness/consultant since 2001 and as such have sat on both sides of the table evaluating cases for both plaintiff and defense. Of the cases I have accepted for review, approximately 80 percent are for the plaintiff and 20 percent for the defense. Thus far, I have reviewed over 275 cases in over thirty states and have provided expert testimony on approximately 171 occasions. I have also testified in at trial numerous 1983 civil federal actions. For the most part, my expertise is in the area of use of force but I have provided testimony in the areas of proper investigative procedures and police supervision. I consider cases for both defense and plaintiff, and favor neither.

- In April 2009 I consulted for a Hollywood production company by reviewed and providing creative feedback on a screenplay for a television pilot. The company, Saint of Circumstance Productions is a Twentieth Century Fox Company.

- I have served as consultant for the Federal Research Division of the U.S. Library of Congress and the Director of Central Intelligence Crime and Narcotics Center in Washington DC (in January 2003.)

- I have conducted police training seminars for the Public Agency Training Council located at 5101 Decatur Blvd. Ste. L., Indianapolis, IN. Topics included: criminal investigation; undercover operations and informant management (in Columbus, OH (1989-1991).

- In 2006 I, along with two police detectives, wrote a model policy and companion paper on digital crime scene photography for the International Association of Chiefs of Police (IACP), which is used as a national guideline for police policy development. This model policy is currently available through the IACP.

## ORGANIZATIONAL AFFILIATIONS

- International Association of Chief's of Police (IACP)
- Academy of Criminal Justice Sciences (ACJS)
- American Society of Criminology (ASC)
- American Academy of Forensic Science (AAFS
- American College of Forensic Examiners International (ACFEI)
- The International Association for the Study of Organized Crime (IASOC)