# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| LINDA SURRATT, Individually and as | § | |
| Heir and Legal Representative of the | § | |
| Estate of LESA ANN SURRATT | § | |
| | § | |
| V. | § | CASE NO. 4:14-CV-338 |
| | § | Judge Mazzant |
| OFFICERS BRIAN MCCLARAN, TOM | § | |
| CAVER, TREVOR STEVENS & CITY OF | § | |
| SHERMAN | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendants' Motion for Summary Judgment (Dkt. #29), Plaintiff's Motion to Conflict Counsel (Dkt. #66), Plaintiff's Motion to Defer Ruling on Summary Judgment (Dkt. #67, #68), and Defendants' Objections to and Motion to Strike Plaintiff's Summary Judgment Evidence (Dkt. #76).  After reviewing the motions and the relevant pleadings, the Court finds that Defendants' motion to strike is denied as moot, Plaintiff's motions to defer and to conflict counsel are denied, and Defendants' motion for summary judgment is granted.

## BACKGROUND

On August 20, 2013, Sherman Police Officer Tom Caver ("Caver") effected a traffic stop of Lesa Ann Surratt ("Surratt") (Dkt. #16 at p. 4).  According to Defendants, Caver conducted a pretext traffic stop of Surratt for a traffic violation (signaling one direction but then turning the other) pursuant to information that Sergeant Jason Jeffcoat received that Surratt was in possession of narcotics (Dkt. #29 at p. 3).  Officer Trevor Stevens ("Stevens") arrived as backup during the stop, and the officers arrested Surratt for the traffic violation and her passenger

1

Monica Garza ("Garza") for outstanding traffic warrants, handcuffed both individuals, and placed each of them into the back seat of Caver's vehicle (Dkt. #16 at p. 5; Dkt. #29 at p. 4).

Defendants and Plaintiff argue different interpretations of the following series of events. It is, however, undisputed that Caver and Stevens walked to, and Caver searched, Surratt's vehicle while Surratt and Garza sat in the back of Caver's vehicle (Dkt. #28 at p. 4; Dkt. #29 at p. 4). While unattended and unsupervised, Surratt freed a hand from her handcuffs, removed a small plastic bag of cocaine from her groin area, and placed the bag in her mouth (Dkt. #28 at p. 5; Dkt. #29 at p. 4).

At nearly the same time that Surratt was placing the bag in her mouth, Caver said to Stevens, "Might want to watch them; they're supposed to be hiding stuff in their bra." (Dkt. #33, Ex. 2(a), 2(b) at 14:09).[1] Stevens returned to the left side of Caver's vehicle, nearest to Surratt, and opened the back door. Stevens, apparently hearing the sound of an item hitting the floor, asked Surratt, "What did you do? What did you drop?" (Dkt. #33, Ex. 2(a), 2(b) at 14:23; Dkt. #32, Ex. 1(a) at 3:32). Surratt denied dropping anything, and Stevens then used his radio to tell Caver to come to the vehicle, and subsequently ordered Surratt not to move (Dkt. #33, Ex. 2(a), 2(b) at 14:31). Caver walked to and opened the back right door, and Stevens directed Caver, stating, "Get 'em out one by one. They were trying to hide something." (Dkt. #33, Ex. 2(b) at 14:44). Garza stated that she was not trying to hide anything and did not drop anything (Dkt. #33, Ex. 2(b) at 14:51). Stevens assessed, "She's got her britches pulled up, it's in her, it's in her pants." (Dkt. #33, Ex. 2(b) at 14:53).

---

[1] Recording equipment captured video and audio of the incident from before Surratt and Garza were placed in the vehicle through the time at which they were removed. The Court references video taken from the dashboard camera of Stevens' car, parked behind Caver's car (Dkt. #32, Ex. 1(a)), Caver's dashboard camera (Dkt. #33, Ex. 2(a)), and Caver's backseat camera (Dkt. #33, Ex. 2(b)).

Caver reached across Garza to grab Surratt's right hand and stated, "Yeah she's got it behind her back here." (Dkt. #33, Ex. 2(b) at 14:57).   As he reached in, Caver shined his flashlight in Surratt's face and then directed Surratt, stating, "Open your mouth up." (Dkt. #33, Ex. 2(b) at 15:00).  Surratt did not comply, and Caver pushed his flashlight against Surratt's face, but she continued to keep her mouth closed, and the officers again told her to open her mouth (Dkt. #33, Ex. 2(b) at 15:03).   Stevens then pressed his right forearm against Surratt's left jawline and the left side of Surratt's neck, and at the same time, Caver pressed his left thumb into the back of Surratt's right jaw area, employing what Defendants have described as a "pressure point technique" (Dkt. #33, Ex. 2(b) at 15:05; Dkt. #29 at p. 1).   Surratt then pulled her hands, free from the handcuffs, out from behind her back and attempted to pull Caver's hand from her neck, and a struggle ensued in which Surratt pulled away from Caver toward the left side of the vehicle and into Stevens' forearm, still positioned into Surratt's neck, while Caver reapplied and continued to apply force to the right side of Surratt's jaw (Dkt. #33, Ex. 2(b) at 15:08-15:17).

One of the officers then noted, "She swallowed it. She got her handcuff off and swallowed it." (Dkt. #33, Ex. 2(b) at 15:17).  Caver was able to get ahold of Surratt's right hand, and pulled Surratt's body across Garza's and out of the car while Stevens struggled to free Surratt, who was still buckled in, and whose leg was then twisted in the seat belt (Dkt. #33, Ex. 2(b) at 15:27).  It is not immediately apparent from the video to what degree Surratt actively resisted being pulled out of the car, whether her reactions were an involuntary response to choking, or whether she was unconscious and limp, but by the time Surratt was pulled halfway out of the car, her loose arm fell limp (Dkt. #32, Ex. 1(a) at 5:30).  While they were removing Surratt from the vehicle, Caver radioed for more units to be sent and for an ambulance to be dispatched (Dkt. #33, Ex. 2(b) at 15:45, 16:07).  Sergeant Jeffcoat approached and stated either,

"Here, Taser" or, alternatively, "Here, tase her" (Dkt. #33, Ex. 2(b) at 16:20).   Caver immediately responded in the negative, "Nah, nah, nah, she might be seizing, she ate a bunch of dope.  She got her handcuff out, she ate a bunch.  She ate a bunch." (Dkt. #33, Ex. 2(b) at 16:23). The officers noted that Surratt was not breathing and that she was probably choking, and told additional officers coming to the scene that they had an ambulance on the way (Dkt. #33, Ex. 2(b) at 16:45, 16:52; Dkt. #32, Ex. 1(a) at 5:59).

Caver told another officer to tell the emergency responders that the ambulance needs to hurry because Surratt is not breathing. Detective Brian McClaran ("McClaran") approached during this time and repeatedly instructed Surratt to open her mouth until one of the officers suggested the Heimlich Maneuver, after which McClaran began pushing on Surratt's chest and stomach area. (Dkt. #32, Ex. 1(a) at 6:29).  The officers then rolled Surratt onto her side and Caver pushed on Surratt's back, instructing Surratt to breathe (Dkt. #32, Ex. 1(a) at 6:34).  For the next several minutes, multiple officers made attempts to get Surratt to breathe.  A Sherman Fire Department Fire Truck arrived a few minutes later and took over life-saving measures, removing with larygo blade and forceps a plastic bag from Surratt's throat (Dkt. #32, Ex. 1(a) at 11:00; Dkt. #36, Ex. 3 at p. 79; Dkt. #34 at p. 83).  The ambulance arrived two minutes later and Surratt was loaded and driven away (Dkt. #32, Ex. 1(a) at 13:00).

Surratt was taken to a local hospital and placed on life support, and on September 2, 2013, Surratt died in the hospital (Dkt. #36 at p. 79).  The autopsy report listed Surratt's cause of death to be "as a result of complications of asphyxia due to airway obstruction by plastic bag." (Dkt. #16 at p. 6) (quoting Dkt. #36, Ex. 3, p. 72).

On May 25, 2014, Plaintiff Linda Surratt, decedent Surratt's sister, brought claims in her individual capacity and her capacity as heir and legal representative of the Estate of Lesa Ann

Surratt, against the City of Sherman ("the City"), "Brian McClarin" [sic], and several unidentified "John Doe" officers, demanding money damages pursuant to 42 U.S.C. § 1983 and § 1985 for "violations of civil rights, and conspiracy to violate civil rights, and privileges guaranteed Plaintiff by the United States Constitution and under the common law of the State of Texas." (Dkt. #1).  Defendants filed an answer on July 8, 2014 (Dkt. #16).  On September 25, 2014, Plaintiff filed a first amended complaint (Dkt. #19) and on January 13, 2015, a second amended complaint (Dkt. #28).  On October 22, 2014, Defendants filed an answer to the first amended complaint (Dkt. #25).  On January 27, 2015, Defendants filed an amended answer (Dkt. #37) and the present motion for summary judgment (Dkt. #29).

In addition, Plaintiff filed a motion to conflict counsel (Dkt. #66) on May 26, 2015, and a motion to defer ruling on summary judgment pending adequate discovery (Dkt. #67, #68) on May 27, 2015.  Defendants responded to the motion to conflict on June 5, 2015 (Dkt. #74).  On June 9, 2015, Defendants filed a motion to strike Plaintiff's summary judgment evidence (Dkt. #76), and on June 16, 2015, Plaintiff filed a response (Dkt. #81).

In her second amended complaint, Plaintiff asserts claims for excessive force, unreasonable search and seizure, violation of right of due process – duty to protect pretrial detainees, conspiracy to deprive Surratt of her constitutional rights, a cause of action against the City of Sherman, and Texas state law claims for wrongful death, assault and battery, and breach of fiduciary duty.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits

"[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment.  *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted).  The substantive law identifies which facts are material.  *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id.* at 247.  If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49).  The nonmovant must adduce affirmative evidence.   *Anderson*, 477 U.S. at 257.   No "mere denial of material facts nor…unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden.  *Moayedi v. Compaq Computer Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004).  Rather, the Court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant.  *United*

6

*States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001).   The Court must consider all of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Defendants request summary judgment on all claims, asserting that Plaintiff states no actionable federal or state law claim in her individual capacity, that qualified immunity bars the Estate of Surratt's federal claims against the individual Defendants, that official immunity and lack of standing bars the Estate's state law claims of assault and battery and breach of fiduciary duty, and that the Estate has no federal law claim for municipal liability against the City of Sherman.

*Motion to Defer Summary Judgment*

Plaintiff incorporates, in her response to the motion for summary judgment, a motion to delay ruling on the motion for summary judgment until additional facts are made available (Dkt. #67 at pp. 2-3).   Rule 56(d) directs that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may… defer considering the motion." Fed. R. Civ. P. 56(d).   The Court finds that Plaintiff does not demonstrate that she cannot present facts essential to justifying her opposition to the motion for summary judgment, and denies Plaintiff's request for further deferment of this decision.

*Motion to Conflict Counsel*

Plaintiff moves to conflict counsel representing the individual officers and the City of Sherman (Dkt. #66).   Plaintiff asserts that the interests of the City and the police officer defendants are in conflict, as the City could claim that the actions of the police officers were

outside the policies, customs or practices of the City, and would therefore not be liable as a municipality (Dkt. #66 at p. 2).

Plaintiff cites *Van Ooteghem v. Gray*, for the proposition that the interests of a municipality and its police officer defendants who may claim they were acting within policy is in conflict. 628 F.2d 488, 497 n. 7 (5th Cir. 1980), *vacated on other grounds*, 654 F.2d 304 (5th Cir. 1981.[2]  Regardless of the fact that this case was vacated, *Gray* merely states that following *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "a serious problem of conflict of interest could exist in future 1983 actions in which one attorney represents both a county and a county official individually," however, this potential for conflict does not mean that there is a conflict of interest. *Id.*  Here, the Defendants have argued that the individual officers did nothing illegal and acted in the course and scope of their employment.  There is no conflict of interest inherent in this position, and no cited case proves otherwise; if this position is proved, neither the City nor the officers would be liable.  That the Defendants are capable of arguing an alternative position that would pit the City against its officers is not evidence of a conflict of interest.

Plaintiff additionally cites *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1263 (5th Cir. 1983), *Smiley v. Director, Office of Workers Compensation Programs*, 984 F.2d 278 (9th Cir. 1993), *Shadid v. Jackson*, 521 F.Supp 87, 88-90 (E.D. Tex. 1981), and *Dunton v. County of Suffolk*, 729 F.2d 903, *amended on other grounds*, 748 F.2d 69 (2nd Cir. 1984).  Two of these cases are not binding precedent in this jurisdiction, and none of these cases demand the extreme measure of requiring that the Defendants be represented by different counsel based on a theoretical conflict that does not appear to exist in this case.  Plaintiff contends that where there is a high potential of conflicting loyalties, disqualification is appropriate.  Here, however, the

---

[2] Defendants improperly attribute a quote to footnote 7 in *Gray* that the Court believes is actually from *Shadid v. Jackson*, 521 F.Supp. 87, 89 (E.D. Tex. 1981). *See* Dkt. #74 at 5.  Nevertheless, the Court is not persuaded by Plaintiff's arguments with regards to *Gray*.

Court is convinced there is not a high potential of conflicting loyalties amongst the Defendants, and it is convinced that Defendants' current counsel can adequately represent the interests of each Defendant.  Plaintiff's motion is, therefore, denied.

*Defendants' Objections to and Motion to Strike Plaintiff's Summary Judgment Evidence*

Defendants ask the Court to strike the testimony and report of Dr. Lyman, the affidavit of Terry Vice, and Plaintiff's references to news articles (Dkt. #76).  The Court, in ruling on Defendants' motion for summary judgment, does not rely upon any of this contested material beyond identifying Plaintiff's general legal positions.  The motion to strike is, therefore, moot.

*Decedent's Status as Arrestee or Pretrial Detainee*

Defendants argue that Surratt should be considered an arrestee rather than a pretrial detainee, and therefore, Plaintiff has no actionable claim under the Fourteenth Amendment (Dkt. #29 at p. 13). Plaintiff does not address the assertion that Surratt was an arrestee and not a pretrial detainee.  Rather, Plaintiff merely assumes that Surratt was a pretrial detainee and argues that the Defendants did not uphold their due process affirmative duty of protection of Surratt as a pretrial detainee (Dkt. #67 at p. 11).

Plaintiff alleges claims based on the Fourth and Fourteenth Amendments of the United States Constitution (Dkt. #28 at ¶¶ 20, 25).  The Fourth Amendment protects a person being arrested from the use of excessive force, but it is not entirely clear under prior case law when precisely arrest ends and pretrial detainment begins. *See Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir. 1998).  The Fifth Circuit has held that the Fourteenth Amendment rather than the Fourth Amendment begins to protect persons "*after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time." *Valencia v.*

*Wiggins*, 981 F.2d 1440, 1443 (5th Cir. 1993) (emphasis in original).  As a general guideline, however, "[a]*ll* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

In *Gutierrez*, the Fifth Circuit analyzed an excessive force claim under the Fourth Amendment and vacated a Fourteenth Amendment claim where officers seized, handcuffed, "hog-tied," and transported a man to a hospital in the back of a patrol car, noting that the incident at issue (the "hog-tying") took place right after the initial seizure of the man and in relatively close proximity to the place where the officers seized him. 139 F.3d at 452.  In *Mayard v. Hopwood*, the Eighth Circuit analyzed an excessive force under the Fourth Amendment where an arrestee asserted that during the ride to police headquarters from the scene of the arrest, an officer slapped and punched her while she was handcuffed in the rear seat of the vehicle. 105 F.3d 1226, 1227-28 (8th Cir. 1997).  In *Brothers v. Klevenhage*, on the other hand, the Fifth Circuit found that the accusing party was a pretrial detainee during the time of accused use of excessive force. 28 F.3d 452, 457 (5th Cir. 1994).  There, the party was arrested, spent a few hours in a cell, and was then turned over to county sheriff's deputies who handcuffed and transported him to county jail. *Id.* at 454.  Upon arriving at the jail, the individual removed the handcuffs and restraints and ran from the vehicle to escape the building. *Id.* Officers called for the man to stop, but as he attempted to crawl under a closing automatic door the officers shot and killed him. *Id.*  The court analyzed this use of force under the Fourteenth Amendment, stating that "[o]nce an individual has been arrested and is placed into police custody, and surely after the

10

arresting officer has transferred the individual to a jail cell, the individual becomes a pretrial detainee, protected against excessive force by the Due Process Clause." *Id.* at 457.

Here, Surratt had not been released from the arresting officer's custody, had not been transferred to a jail cell, and had not been in any form of detention for a significant period of time.  The accused actions involved the arresting officers within minutes of the first incident of arrest near immediate proximity to the site of arrest.   Though Surratt was handcuffed and buckled into the back of a police vehicle, the Court finds that Surratt should still be considered an arrestee at time of the alleged use of force, and therefore, the Court should analyze Plaintiff's excessive-force claims under the Fourth Amendment standard of "objective reasonableness." *Graham*, 490 U.S. at 388.[3]  The Court finds that summary judgment is appropriate on Plaintiff's Fourteenth Amendment claims.

*Qualified Immunity:*

*Section 1983 Claims against Individual Defendants in their Individual Capacities*

Defendants argue that Caver, Stevens, and McClaran are entitled to qualified immunity from Section 1983 claims brought against them (Dkt. #29 at p. 7).  "Qualified immunity protects government officials from liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (quoting *Rockwell v. Brown*, 664 F.3d 985, 990 (5th Cir. 2011).   After a defendant invokes qualified immunity, the burden to demonstrate the

---

[3] *See also, e.g.*, *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000) (applying Fourth Amendment standards to excessive-force claim by arrestee who was taken and booked in local jail and was knocked unconscious by an arresting officer who allegedly opened and pushed the jail cell door into the arrestee); *Wagner v. Bay City, Texas*, 227 F.3d 316, 324 (5th Cir. 2000) (applying Fourth Amendment standards to all incidents of an excessive-force claim where a suspect was not arrested, but was seized, sprayed with pepper spray, handcuffed, and an officer placed a knee on the suspect's back and restrained his head with a stick, allegedly leading to asphyxiation); and *Hill v. Carroll County, Mississippi*, 587 F.3d 230, 232-33 (5th Cir. 2009) (applying Fourth Amendment standards to § 1983 claims where officers intervened in a fight, handcuffed one of the parties, then placed her in four-point restraints in the back of the police vehicle, allegedly leading to positional asphyxia).

inapplicability of the defense shifts to the plaintiff.  *Id.* (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

The Court conducts a two-prong inquiry in order to determine whether qualified immunity applies: the Court asks (1) "whether the undisputed facts and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right, and (2) whether the defendant's conduct was 'objectively unreasonable in light of clearly established law,'" which is based on the state of the law at the time of the alleged incident.  *Id.* (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001)).  A government official's acts are objectively unreasonable when all reasonable officials similarly situated in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights.  *Thompson*, 245 F.3d at 457.

In *Pearson v. Callahan*, the Supreme Court stated that it is not mandatory for courts to analyze both factors nor is a particular order of analysis required. 555 U.S. 223, 236 (2009).  It is understood that "there are cases in which the constitutional question is so factbound that the decision provides little guidance for future cases." *Id.* at 237.  However, the Supreme Court noted that "the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.*

The analytical division between the two factors allows for two goals to be accomplished. First, it allows for understandings regarding the law to evolve and clarify over time.  The first factor allows for dynamism.  The second factor, however, allows for officers to exercise their duties without requiring them to serve as judges as well – officers are held accountable for the current, clearly established law.  The law respects the necessity of allowing for officers to make

quick and difficult decisions, and "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Id.* at 326.

In this case, the Court believes it is both appropriate and important to consider both factors, but will address the second factor first (whether the defendant's conduct was objectively unreasonable in light of clearly established law) as the Court finds that this factor is dispositive. Additionally, Plaintiff's allegations describe both "excessive force" and "search and seizure" claims, but these are simply different phrases to describe the same alleged constitutional violation regarding the use of force to Surratt's neck and throat and the same argument that such force was unreasonable.   Therefore, the Defendants' conduct is analyzed under the excessive force factors set out in *Graham v. Connor*, 490 U.S. 386, 395 (1989).  *See also Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015).

Defendants argue that the officers' actions were not objectively unreasonable (Dkt. #29 at p. 8). They contend that officers never used a chokehold on Surratt, that the video shows Officer Caver only applying pressure to the back of Surratt's right jaw and Officer Stevens applying his forearm to the other side of Surratt's head and neck to prevent her from moving away (Dkt. #29 at p. 8).  Defendants further argue that chokeholds are neither entirely legally impermissible, nor is the application of force to the throat entirely impermissible when used to prevent the destruction of evidence (Dkt. #29 at p. 8).  Defendants argue that the officers used "only the force necessary to attempt to open her mouth," and that "the video evidence conclusively shows that Surratt was not choked, and that neither officer engaged in any malicious or aggressive use of force in their attempt to retrieve the evidence from Surratt's mouth and prevent its destruction." (Dkt. #29 at p. 11).

13

Plaintiff argues that chokeholds are constitutionally unreasonable, including "the particular choking done by officers in this case" (Dkt. #67 at p. 7).  Plaintiff points to secondary sources that describe that some large police departments have banned chokeholds altogether.

In *Espinoza v. United States*, the Fifth Circuit considered the appeal of a motion to suppress evidence obtained by the efforts of officers to retrieve a quantity of narcotics from an arrestee's mouth. 278 F.2d 802, 803 (5th Cir. 1960).  When confronted by officers, the arrestee immediately grasped a small package from his pocket or car seat and put it in his mouth, which officers recognized as an attempt to swallow and destroy what the officers believed was a quantity of narcotics. *Id.* at 804.  The appellate court affirmed the district court's ruling that no more force was used than necessary under the circumstances where officers were accused of grabbing the arrestee about the throat, choking him and attempting to pry open his mouth by placing pressure against his jaw and nose. *Id.*

Plaintiff notes that *Espinoza* was decided in 1960, before *Schmerber v. California* and its progeny. 384 U.S. 757 (1966).  Defendants, however, additionally cite the more recent case *Williams v. Bramer*, wherein an officer conducted a search of a party's mouth based on suspicion that the individual may have been holding crack cocaine in his mouth.  180 F.3d 699, 701-02 (5th Cir. 1999).  The officer had the individual step out of the vehicle, patted him down, placed a hand on his chest and asked the individual to open his mouth.  *Id.*  The individual complied, but after a second pat-down, the officer allegedly grabbed the individual by the throat and started choking him and telling him to "spit it out."  *Id.*  The court found that the individual's temporary loss of breath and coughing and fleeting dizziness was not a "cognizable injury" that rose to the level of a constitutional violation.  *Id.* at 704.  While the Court does not find this case dispositive, as this decision addressed the level of injury rather than the reasonableness of the use of force to

the throat, it does reflect an acknowledgment that the use of force to the throat, or even choking, of an individual suspected of concealing something in his/her mouth is not, on its face, considered a constitutional violation.

Similarly, in *United States v. Harrison*, the D.C. appellate court considered a circumstance where, during the execution of a search warrant, an officer witnessed the suspect swallowing an envelope, grabbed the individual by the throat and succeeded in preventing the individual from swallowing the envelope.  432 F.2d 1328, 1329 (D.C. Cir. 1970).  Though the issue was not before the court, the court stated in dicta that the alleged action did not establish undue force or brutality conflicting with the Fourth or Fifth Amendments.  *Id*. at 1330.

It is clear that previous law has provided no guidance regarding what is precisely reasonable and what is unreasonable regarding the use of force to an individual's throat where the individual appears to be concealing something in their mouth.  However, the case law suggests that some force is not considered to be unreasonable, and, in fact, does not condemn choking or chokeholds as constitutional violations on their face.

Here, Surratt briefly refused to spit out what was in her mouth before the officers began to apply force.  Defendants argue that the officers' conduct was reasonable – Caver's use of a pressure point technique and Stevens' touching of Surratt's head and neck to prevent her movement away from the pressure point technique (Dkt. #29 at p. 11).  Defendants argue that the video evidence conclusively shows that Surratt was not choked (Dkt. #29 at p. 11).  Plaintiff, however, argues that "[t]he combined choking of Surratt by the two officers caused Surratt to gasp for air, and in doing so to inhale the plastic baggie into her windpipe" (Dkt. #28 at p. 6).  The Court does not find the video evidence conclusive in this matter.  The Court will not make a factual determination regarding whether Surratt actively attempted to swallow the baggie or

whether the officers' actions forced Surratt to gasp and swallow the baggie.  In ruling on summary judgment, however, the Court considers the evidence in the light most favorable to the non-moving party.  Therefore, the Court accepts arguendo that the force applied by the officers in tandem caused Surratt to gasp for air, and in doing so to inhale the plastic baggie into her windpipe.

The Defendants maintain that the force applied was merely the force necessary to attempt to open Surratt's mouth (Dkt. #29 at p. 11).  Plaintiff contends that the injury due to the officers' force was death; the need for force was minimal as the officers could use medical examination, regurgitation, or fecal isolation to obtain the evidence and the officers had video capturing the tampering crime; the relationship of the force used to the need for force was unreasonable; the threat to officers was minimal, and there was no tempering of the severity of the force until Surratt was dragged from the vehicle and was unconscious (Dkt. #67 at p. 9).

The Court determines that the video evidence, even taken in the light most favorable to Plaintiff, conclusively demonstrates that, based solely on the clearly established law at the time of the incident, the officers' conduct was not objectively unreasonable.  As in *Espinoza*, the officers perceived an attempt to conceal and possibly to destroy what the officers reasonably believed was illicit drugs.  In *Espinoza*, the officers were accused of grabbing the arrestee about the throat, choking him and attempting to pry open his mouth by placing pressure against his jaw and nose.  Here, the video evidence does not even support as dramatic a use of force.  Plaintiff describes that the use of force caused Surratt to gasp, inhale the baggie and choke, but the officers clearly did not grab Surratt about the throat, did not directly choke her, and did not place any pressure against her nose.  The officers engaged Surratt's neck, jaw, and chest and attempted to force her to open her mouth in order to retrieve what she was concealing.  Plaintiff points to

the banning of chokeholds by certain police departments and a belief, unsupported by case law, that chokeholds are constitutionally impermissible.  Granted, it is not required that the specific police action has been held unlawful, but only that it was apparent "in light of the pre-existing law" that such action was unlawful.  *Wagner v. Bay City, Tex.*, 227 F.3d 316, 322 (5th Cir. 2000) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Plaintiff, however, makes no such showing.  In accordance with case law, each individual's entitlement to qualified immunity is considered separately. *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007).  The officers' actions as individuals, or even considered collectively, demonstrate, however, a similar use of force to that which has been found in established law to be not unreasonable.

Qualified immunity protects an official "whose conduct was objectively reasonable, even if the conduct infringed upon a constitutional right of the plaintiff," and therefore, "even law enforcement officials who reasonably but mistakenly use excessive force are entitled to immunity." *Wagner*, 227 F.3d at 321 (quoting *Gutierrez*, 139 F.3d at 445-47).  As such, the individual defendants are entitled to qualified immunity, and the Court grants summary judgment in regards to Section 1983 claims asserted against them.

*Constitutionality of the Force Employed*

The Court, having determined that, under clearly established law, Defendants' actions were not objectively unreasonable, now turns to the first factor: whether the undisputed facts and the disputed facts, accepting the Plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right.  Here, the specific circumstances of the case elucidate a need to highlight conduct that is a violation of a constitutional right, and should rightly be understood to be unreasonable by officers from this moment forward.

17

In determining whether there was a violation of the Fourth Amendment, the Court must balance the "governmental interests alleged to justify the intrusion" against the "nature and quality of the intrusion on the individual's Fourth Amendment interests."  *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).  In determining an officer's objective reasonableness, the Court should pay "careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.   Further, reasonableness is determined from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*.

The Supreme Court has stated that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  In considering the reasonableness of the use of force, the Court gives "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Carroll*, 800 F.3d at 173 (quoting *Graham*, 490 U.S. at 396).[4]

"Even if a suspect is engaging in some level of resistance, an officer's use of force is objectively unreasonable if its severity is disproportionate to the level of resistance offered by the

---

[4] In a similar citation Defendants' brief reads, "The court views the totality of the circumstances, including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers, *herself*, or others, and whether the suspect is actively resisting arrest, or trying to flee from the officers." (Dkt. #29 at p. 10) (emphasis added).  The Court notes, however, that the case cited for this proposition does not specifically require consideration of the immediate threat to the safety of the suspect (or arrestee) as stated in Defendants' brief.  The Court does not find that the safety of the arrestee is irrelevant when considering the reasonableness of officers' actions, but the Court does not look fondly upon self-serving misstatements of case law.  This question of credibility is of particular consequence here as the reasonableness of the force used could be balanced differently if particular consideration or priority is given to the safety of officers and others or, as inserted *sua sponte* by the Defendants', the safety of the suspect (or arrestee).

suspect." *Lawson v. Martinez*, 2015 WL 1966069, at *13 (W.D. Tex. 2015) (citing *Chacon v. Copeland*, 577 F. App'x. 355, 361-62 (5th Cir. 2014)).

As previously discussed, however, courts generally have not found that application of force to an arrestee's throat is objectively unreasonable. *See Espinoza*, 278 F.2d at 802. This Court, however, largely agrees with the Supreme Court of Utah's analysis of the Fourth Amendment in *State v. Hodson*, 907 P.2d 1155, 1159 (Utah 1995).[5] In *Hodson*, officers effected an arrest, during which the suspect was "dragged from his vehicle, thrown to the ground, and ordered to spit out what was in his mouth by an officer whose arm was around his neck." *Id.* at 1158. The Utah Supreme Court spoke at length on the use of force toward a suspect's neck:

> Once again, we conclude that whether or not this defendant's airflow or blood supply was actually impaired, the level of violence and force used by the officer was unreasonable because of the enormous *risk* of such results. It is not plausible to us that in a struggle of this nature, there would not be a very high risk of choking and a very low likelihood of a careful 'placing' of hands on the suspect's neck to prevent swallowing without choking. . . . The dangers presented by constricting the throat make such force anything but reasonable. . . . In the refined atmosphere of an appellate court, we can discuss the possibility of a specialty grip that prevents swallowing without choking. However, in the arrest situation, the necessity of immediately constricting the throat and the suspect's predictable lack of cooperation preclude carefully selecting points on the throat prior to applying force. . . .
>
> Furthermore, drugs ingested in this manner can only follow two paths: Either they will pass through the system intact because of their packaging, or they will be absorbed into the bloodstream of the swallower. In either event, they are susceptible to identification and recovery in supervised, nonviolent post-arrest settings. No emergency or exigency justifies the use of force at this level to preserve evidence which would be readily (if inconveniently) accessible through nonviolent means. . . . It is true that a suspect has no right to refuse an order to disgorge, but refusal does not lift all limits on what is reasonable police behavior. . . .
>
> It is true that the majority of courts that have considered the question have permitted some degree of touching of a suspect's throat to prevent swallowing, so

---

[5] While *Hodson* addressed the reasonableness of force with regards to a search and seizure claim and the suppression of evidence, the Court finds its analysis of force directed toward the throat of an arrestee to be applicable to the present excessive force claims.

> long as no impairment of breathing or blood flow results.  We think that the facts of this case demonstrate the policy mistake those courts have made.  The test, as articulated by the court of appeals, contemplates a careful, measured use of the hands to prevent swallowing but not to interfere with life functions.  The atmosphere of this search contained nothing careful or measured; it was split-second, violent, and noisy, as surely a majority of "drug busts" must be.  Moreover, the risks to the health and safety posed by uncareful hands are extreme.  We agree with the assessment of the California Court of Appeals in [*People v. Trevino*, 72 Cal. App. 3d 686 (Cal. App. 1977)]: "The application of force to a person's throat is a dangerous and sensitive activity.  It is the type of force that, more than any other, is likely to result in violent resistance by the arrestee."

*Id.* at 1158-59.

When applying force affecting an arrestee's breathing while he or she has, or is believed to have, an item in his or her mouth, the Court believes that such force is only constitutional where time is clearly given to elicit a voluntary release of the concealed item and the use of force is conducted in the most controlled and precise manner possible under the circumstances.  The Court comes to this conclusion considering the great extent of potential injuries involved in applying pressure that can compromise an individual's ability to breathe, particularly recognizing the speed at which death can occur after choking begins.  This danger weighs very heavily, particularly considering the relative insignificance of the crime at issue and the lack of a threat to the safety of the officers or other individuals. *See Graham*, 490 U.S. at 396.

The Court finds that Caver's continued use of a pressure point technique—pushing Surratt's head into Stevens' forearm—and Stevens' use of the forearm as a backstop against Caver's pushing were unreasonable actions considering that Surratt clearly had an object in her mouth, they gave Surratt very little time to comply, and the force was administered in far from the most controlled and precise manner possible.  The Court is "careful not to engage in second-guessing officers in situations in which they have to make split-second, on-the-scene decisions while confronted with a violent individual," but nothing in the briefs or video suggests that

Surratt acted violently at any moment leading up to the application of force. *Wagner*, 227 F.3d at 321.  The presence of an object in Surratt's mouth and her refusal to open her mouth did prompt a split-second, on-the-scene decision, but that decision did not in any way relate to self-defense or protection of other citizens relating to a violent individual.  When viewed in the light most favorable to Plaintiff, the video demonstrates that Surratt only leaned away from the pressure point and removed her hand from behind her back to resist the pressure being applied to her neck and chest rather than to strike or push against anyone.  Most notably, as distinguished from other cases where courts have not found the force violated constitutional rights, here, Caver and Stevens applied force in an imprecise way—in the back of the vehicle, reaching across another individual's body, with very limited room to operate, with the arrestee strapped in and restrained—such that they were unable to prevent Surratt from swallowing the item, and perhaps actually caused Surratt to inhale the item and asphyxiate.

The Court finds that the difficulty the officers had in removing Surratt from the vehicle was a direct result of initiating the force inside the confined space of the police vehicle.  From this position, the officers were unable to maintain control of Surratt's body and were, therefore, in no position to begin to assess or control the situation once Surratt began to choke.  The officers offer no justification as to the necessity for administering force in the manner in which they executed it.  The fact that an officer may be allowed to prevent a suspect from swallowing in order to recover evidence is not a blanket grant to apply force however the officers deem appropriate.

The Court does not presume to know what would have happened if the officers had given Surratt more time to comply, had engaged Surratt outside of the vehicle together with greater physical control over Surratt's person, or had been in a better position to react if she did in fact

21

begin to choke.  However, the Court believes the unnecessarily quick and imprecise use of force was objectively unreasonable and a violation of Surratt's constitutional rights.

The standard for excessive force is one of reasonableness in light of the circumstances presented to the officer at the time of the incident; the officer's good or ill intent is not relevant. *Graham*, 490 U.S. at 397.  While it is not relevant to the analysis before the Court, the Court notes that the officers demonstrated no apparent malice or intention to harm.  At the absolute first moment the officers realized Surratt might be choking and the situation required medical professionals, the officers called for an ambulance and radioed updates urging speed because Surratt was not breathing.  Various officers clearly attempted to render aid to Surratt outside of the vehicle.  Finding that the officers violated Surratt's rights where the law has provided little helpful guidance is not to say that the officers were the cause of Surratt's death, or even bad actors.  In fact, it is entirely reasonable to consider that the officers may have been doing their best to protect Surratt from ingesting a dangerous substance.  This finding merely clarifies that officers should not administer force in this manner.

At the same time, the Court acknowledges the great tragedy of Surratt's death.  In considering the amount of force that is appropriate for officers to employ in keeping the peace, it is essential to remember that on the other side of this legal analysis are human lives, affected, not only by their own choices, but also by the choices made at the discretion of officers.  The law "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law," and therefore, qualified immunity applies in this case, and summary judgment is appropriate.  However, it is also the Court's view that officers are called to more: to be diligent and to improve on the manner in which they administer force and serve the

public.  It is the Court's intention that, by providing further guidance regarding the use of force, officers will have a more clear understanding of the limit of what is constitutionally permissible.

The case law concerning police discretion and the application of qualified immunity reflects nothing short of the deepest reverence for the service, skill, and training of our society's police officers.  It is precisely because of its respect for the work and position of police officers that the Court believes that the standard of the "reasonable officer" should be correspondingly sophisticated.  Therefore, the Court intends that, in light of this ruling, officers under this jurisdiction will understand that when applying force affecting an arrestee's breathing while he or she has, or is believed to have, an item in his or her mouth, such force is only constitutional where time is clearly given to elicit a voluntary release of the concealed item and the use of force is conducted in the most controlled and precise manner possible under the circumstances.

*Conspiracy*

Defendants move for summary judgment on Plaintiff's claims of conspiracy, asserting that there are no federal claims that may form the predicate of a federal conspiracy claim and that Plaintiff does not appear to contest that she fails to present anything more than conclusory allegations of conspiracy (Dkt. #29 at p. 15; Dkt. #72 at p. 8).  "Mere conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy." *McAfee v. 5th Circuit Judges*, 884 F.2d 221 (5th Cir. 1989), *cert. denied*, 493 U.S. 1083 (1990).  Plaintiff's brief does not address Defendants' arguments regarding her conspiracy claim.  Therefore, the Court accepts that Plaintiff tacitly concedes this claim and summary judgment is proper.

*Claims against the City for Failure to Train or Supervise*

To demonstrate a claim for failure to train, a plaintiff must show "that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010).

Defendants contend that "Plaintiff has not identified any policy or custom—or lack of a policy—that might have violated federal law, authorized the deprivation of federal rights, or which was adopted or maintained with deliberate indifference as to known or obvious consequences." (Dkt. #29 at p. 17).  Defendants also argue that Plaintiff does not allege a pattern of similar incidents. Further, Defendants assert that Plaintiff does not demonstrate that the alleged failure to train represented the moving force behind a constitutional violation. Defendants maintain that Plaintiff presents no evidence that demonstrates a failure to train, or that any such failure amounts to deliberate indifference, or evidence that training was inadequate to prepare them to address "the usual and recurring situations they would face as peace officers." (Dkt. #29 at pp. 17-18).

Plaintiff contends that the City of Sherman "approved of and encouraged the practice of pressure pointing suspects, which amounted to a custom or policy" (Dkt. #67 at p. 12).  Plaintiff does attempt to point to a pattern of similar incidents, partially under the "single incident" exception (Dkt. #67 at pp. 12-13), but does not show how "the City's purported lack of a policy 'banning' or 'prohibiting choking' might have violated federal law, authorized the deprivation of federal rights, or was adopted or maintained with deliberate indifference as to known or obvious consequences." (Dkt. #72 at p. 9).

24

Plaintiff does not substantiate her claim by demonstrating that the City's alleged custom or policy exists, merely explaining that the City's policies do not prohibit choking or "pressure pointing" a detainee to retrieve suspected drug evidence, and that the lack of an internal affairs investigation demonstrated that the City believes the officers' actions were in line with policy, custom, and practice (Dkt. #67 at p. 12).

"[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).

Crucially, the Court finds that even if a policy that approved and encouraged the practice of pressure pointing suspects did exist, Plaintiff offers no evidence that demonstrates that such a policy is constitutionally impermissible for officers to employ, and does not demonstrate that this policy was a "moving force" in a violation.

*Supervisory Liability*

Defendants argue that summary judgment is appropriate on Plaintiff's supervisory liability claim against Detective McClaran as there is no basis to conclude that he contributed to the use of force against Surratt.

Plaintiff contends that McClaran failed as a supervisor to protect the health, safety, and welfare of Surratt by placing her in "an unreasonably dangerous custodial environment when she was arrested without any intent on the police's part of Surratt being searched until she was taken to the Grayson County Jail," and that he acted with deliberate indifference to her Constitutional rights (Dkt. #67 at pp. 11-12).

An officer cannot be held liable under Section 1983 on the basis of respondeat superior. *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 443, 453 (5th Cir. 1997).  Plaintiff does not

set forward any basis to conclude that McClaran contributed to the use of force against Surratt, and does not point to any case law supporting the assertion that, as supervisor, he is liable for her injury.  Plaintiff merely accuses and condemns McClaran in broad generalizations, but does not substantiate any cause of action for supervisory liability against McClaran.  As such, summary judgment is appropriate on Plaintiff's supervisory liability claim.

*Official Immunity on State Assault and Battery*

Official immunity protects governmental employees "from suit arising from the performance of their (1) discretionary duties in (2) good faith as they are (3) acting within the scope of their authority."  *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). "The 'good faith' test applied by Texas law in determining official immunity is evaluated under substantially the same standard used for qualified immunity determinations in [Section] 1983 actions." *Meadours v. Ermel*, 483 F.3d 417, 424 (5th Cir. 2007).  Texas' good-faith test focuses, however, not on whether the right alleged to have been violated is clearly established, but solely on the objective legal reasonableness of the officer's conduct. *See Chambers*, 883 S.W.2d at 656-57.

Defendants contend that "a reasonably prudent officer, under the same or similar circumstances, could have believed" that the decision to use force against Surratt was justified. *Id.* at 656.

Plaintiff concedes that her assault and battery claims are barred by official immunity under Texas law (Dkt. #67 at p. 15). *See Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608 (Tex. 1996).  Plaintiff's claims for assault and battery are, therefore, dismissed.

*Fiduciary Relationship*

Defendants argue that no fiduciary relationship existed between Surratt and the officers. Further, Defendants argue that Plaintiff does not allege any specific facts that could establish the existence of a fiduciary duty, or law that acknowledges the existence of such a fiduciary relationship, or, regardless, that there was a breach of such a duty (Dkt. #29 at p. 20, Dkt. #72 at p. 4).

Plaintiff proposes the creation of a fiduciary relationship not recognized under the law, and provides no support for the establishment for a breach of fiduciary duty claim in this context. The Court finds no basis for recognizing Plaintiff's novel conception of a fiduciary relationship, and as such, summary judgment is merited on Plaintiff's fiduciary relationship claim.

*Individual Capacity Claims*

Finally, Defendants note that to the extent that Plaintiff brings federal law claims and state law claims in her individual capacity, she was not present at the scene, was not deprived of any federal or constitutional rights, and neither Section 1983 nor Texas state law provide for siblings of a deceased to be eligible for beneficiaries in a wrongful death action, and therefore summary judgment is proper (Dkt. #29 at p. 21).  Plaintiff did not challenge dismissal of her individual capacity claims (Dkt. #67).

As Plaintiff does not contest Defendants' request for summary judgment, the Court assumes Plaintiff tacitly concedes these issues, and claims made in Plaintiff's individual capacity are dismissed.

**CONCLUSION**

Based on the foregoing, the Court finds that Defendants' Motion for Summary Judgment (Dkt. #29) is hereby **GRANTED**, Plaintiff's Motion to Conflict Counsel (Dkt. #66) is hereby

**DENIED**, Plaintiff's Motion to Defer Ruling on Summary Judgment (Dkt. #67) is hereby

**DENIED**, and Defendants' Objections to and Motion to Strike Plaintiff's Summary Judgment

Evidence (Dkt. #76) is hereby **DENIED** as moot.

   **SIGNED this 3rd day of March, 2016.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE